**ASSOCIATION OF CHRISTIAN SCHOOLS INTERNATIONAL, et al., Plaintiffs,**

v.

**Roman STEARNS, et al., Defendants.**

**No. CV 05–6242 SJO (MANx).**

United States District Court, C.D. California.

March 28, 2008.

Jennifer Lynn Monk, Advocates for Faith and Freedom, Murrieta, CA, for Plaintiffs.

Wendell Raleigh Bird, Jonathan T. McCants, Bird Loechl Brittain and McCants LLC, Atlanta, GA, Robert H. Tyler, Advocates for Faith and Freedom, Murrieta, CA, for Plaintiffs/Defendants.

Bradley S. Phillips, Munger Tolles & Olson, Los Angeles, CA, Christopher M. Patti, James E. Holst, University of California, Oakland, CA, Michelle T. Friedland, Rebecca Gose Lynch, Stuart N. Senator, Munger Tolles and Olson LLP, San Francisco, CA, Craig P. Alexander, Law Offices of Craig P. Alexander, Dana Point, CA, Kristen K. Waggoner, Ellis, Li & McKinstry, PLLC, Seattle, WA, for Defendants.

## ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT [Docket Nos. 70 & 71]

S. JAMES OTERO, District Judge.

This matter is before the Court on Plaintiffs' Motion for Summary Judgment and Defendants' Motion for Partial Summary Judgment, both filed on August 27, 2007. Oppositions and Replies have been filed as to both Motions. After hearing argument on February 14, 2008 and carefully considering all admissible documents and the arguments made in support of and in opposition to each Motion, the Court DENIES Plaintiffs' Motion for Summary Judgment and GRANTS Defendants' Motion for Partial Summary Judgment.

*Table of Contents*

I. BACKGROUND ................................................1088
 A. The UC Admissions Process.............................1088
 B. The A–G Guidelines..................................1089
 C. The "A–G Policies"..................................1089
 D. The Parties' Motions for Summary Judgment ...........1090

II. DISCUSSION .................................................1090
 A. The Scope of Plaintiffs' Facial Challenge............1091
 1. The "Single Religious Viewpoint Policy" ...........1091
 2. The "History and Social Science Policy" ...........1093
 3. The "Science Policy"...............................1094
 B. Plaintiffs' Facial Constitutional Claims ............1094
 1. The Free Speech Clause ............................1094
 a. Viewpoint Discrimination and Content Regulation .................1094
 i. The A–G Guidelines and Policies Must Be Rationally Related to UC's Educational Goal of Admitting Qualified Students ........................................1098
 (a) Are the A–G Guidelines and UC Position Statements Substantively Reasonable? ............................1099
 (1) UC Position Statement on Religion and Ethics Courses ......................................1099
 (2) UC Position Statements on Science and History Courses ......................................1100
 (b) Are the Reviewers Qualified? ............................1100
 (c) Is the UC Course Review Process Unreasonably "Probabilistic"? ........................................1101
 (d) Is Reviewing Only California High School Courses Reasonable? ......................................1101
 ii. Defendants Cannot Implement Regulations Because of Animus Toward Religion, Even If Those Regulations Are Rationally Related to UC's Educational Purpose ............1102
 b. Overbreadth ................................................1105
 c. Unbridled Discretion .......................................1106
 i. Plaintiffs Cannot Challenge the A–G Guidelines and Policies Under the "Unbridled Discretion" Doctrine..........1106
 ii. Even If Permitted, Plaintiffs' "Unbridled Discretion" Challenge Would Fail ....................................1108
 2. Free Exercise and Establishment Clauses ...........1108
 a. Hostility Toward Religious Schools .........................1108
 i. Symbolic Hostility Under the Establishment Clause ...........1109
 ii. Burdensome Hostility Under the Free Exercise Clause .........1110
 b. Prescription of Orthodoxy ..................................1111
 3. Equal Protection Clause ...........................1112
 C. Plaintiffs' "As Applied" Constitutional Claims ..........1112
 1. Free Speech Clause ................................1112
 a. Plaintiffs' Rejected Biology Courses........................1113
 b. Plaintiffs' Rejected History and Government Courses ...............1114
 c. Plaintiffs' Rejected English Course ............................1115
 d. Plaintiffs' Rejected Religion Courses ......................1116
 2. Free Exercise and Establishment Clauses ...........1116
 a. Symbolic Hostility Under the Establishment Clause ...............1116
 b. Burdensome Hostility Under the Free Exercise Clause .............1118
 3. Equal Protection Clause ...........................1119

III. RULING ....................................................1119

## I. BACKGROUND

Defendants are the University of California ("UC") employees responsible for developing and implementing the admissions policy by which applicants are selected to attend UC.[1] Plaintiffs are the Calvary Chapel Christian School ("Calvary"), five Calvary students, and the Association of Christian Schools International ("ACSI").

Plaintiffs have brought suit against Defendants, alleging that the UC admissions policy is unconstitutional under the Free Speech Clause, the Free Exercise Clause, the Establishment Clause, and the Equal Protection Clause.

### A. The UC Admissions Process

Each year, UC must decide which of California's more than 360,000 high school graduates will be admitted to attend one of UC's ten campuses. (Defs.' MSJ 2.) California applicants are admitted to UC only if they qualify through one or more of the following four "Paths":

Path 1: By meeting specified requirements for coursework, grade point average, and test scores.

Path 2: By ranking in the top four percent at participating California high schools.

Path 3: By scoring exceptionally high on standardized tests.

Path 4: By demonstrating the potential to succeed at UC despite not falling in any other category.

(Lynch Decl. No. 1 Exs. 1 (describing Paths 1, 2, and 3), 19 (describing Path 4).)

About eighty-two percent of California applicants who are admitted to UC qualify only through Path 1 or Path 2. (Pls.' Exs. 62, 64.)[2] To qualify through Path 1 or 2, the applicant must demonstrate proficiency in seven specific subjects: (a) history and social science; (b) English; (c) mathematics; (d) laboratory science; (e) foreign languages; (f) the visual or performing arts; and (g) electives. (Lynch Decl. No. 1 Exs. 4, 17.) UC refers to these seven subjects as the "A–G Subjects."

A student may demonstrate proficiency in an A–G Subject by achieving a sufficiently high grade or score:

(a) in UC-approved high school courses;

(b) in a college course at an accredited university;

(c) on the corresponding SAT II subject test; or

(d) on the International Baccalaureate or Advanced Placement exam.

(Wilbur Decl. ¶ 8.) Nearly all of the applicants qualifying through Paths 1 and 2 demonstrate proficiency in the A–G Subjects by taking UC-approved high school courses. (Defs.' MSJ 4.) Plaintiffs' constitutional claims center on UC's method for approving high school courses.[3]

---

1. These UC employees are Roman Stearns (Special Assistant to the UC President), Susan Wilbur (Director of Undergraduate Admissions), Robert Dynes (UC President), Michael Brown (former Chair of the Board of Admissions and Relations with Schools ("BOARS")), and Judy Sakaki (Vice President for Student Affairs).

2. More than sixteen percent of California students admitted to UC score high enough on standardized tests to qualify through Paths 1, 2, and 3. (Pls.' Ex. 64, at 68.) Only one percent are admitted to UC solely through Path 3 (Pls.' Ex. 62, at 41.) Another one percent of students are admitted solely through Path 4. (Pls.' Ex. 65, at 180.)

3. Plaintiffs erroneously argue that the UC course review process "render[s] Christian school students ineligible for ninety-eight percent of the seats in the entering class" because of rejected Christian school courses. (Pls.' MSJ 29.) Even setting aside that students have alternative ways to demonstrate proficiency in the A–G Subjects, eighteen percent of California students are admitted without needing to demonstrate proficiency (not two percent, as Plaintiffs contend). Further, if ninety-eight percent of Christian school stu-

## B. *The A–G Guidelines*

For an applicant to demonstrate proficiency in the A–G Subjects through high school courses, she must take a minimum number of UC-approved courses. The number of courses a student must take to demonstrate proficiency varies by subject, ranging from a year-long course in the arts to four year-long courses in English. (Lynch Decl. No. 1 Ex. 4.)

UC requires applicants to take approved courses "to make [the UC] eligibility standards substantively meaningful and to ensure that the students whom it guarantees a spot have earned their relevant grades in courses that are sufficiently rigorous to prepare the students for study at UC." (Defs.' MSJ 2 (citing Rashid Decl. ¶ 7).)

High schools seeking course approval must provide UC with a satisfactory course description. (Defs.' Opp'n 6; *see also* Lynch Decl. No. 2 Ex. 93.) The typical course description is three to five pages in length. (Pls.' MSJ 2.) UC evaluates this course description in light of the A–G Guidelines, which provide about one page of general principles per subject area (Pls.' Ex. 61) and hundreds of pages of examples of approved course outlines for each subject (Lynch Decl. No. 1 Ex. 2).

In deciding whether to approve a course, UC reviews the submitted course descriptions to determine whether the course challenges students academically, involves substantial reading and writing, teaches critical thinking skills, emphasizes both analytical thinking and factual content, and develops students' oral and listening skills. (Lynch Decl. No. 1 Ex. 6, at 4; Wilbur Decl. ¶ 10.) UC also seeks to ensure that the course will sufficiently prepare students for UC study. (Lynch Decl. No. 1 Ex. 6, at 4.) Courses that meet these standards are approved.

However, UC will not approve courses that "fail[ ] to teach topics with sufficient accuracy and depth" or "fail[ ] to teach relevant analytical thinking skills." (Defs.' Opp'n 7.)

Occasionally, UC reviews individual textbooks where the subject area is one where "selected texts tend strongly to guide course content" (such as history, mathematics, and science) and the "course outline[ ] raise[s] concerns about whether the course meets faculty guidelines . . . ." (Pls.' Ex. 241.) UC does not interview the teachers, observe classroom instruction, or test the students. (Pls.' MSJ 2.) UC does not review courses taken by applicants from out-of-state high schools (Pls.' MSJ 2), which comprise approximately fourteen percent of the applicant pool and about nine percent of admitted students (Pls.' Ex. 80; Wilbur Decl. No. 2 ¶ 53).

## C. *The "A–G Policies"*

Plaintiffs allege that Defendants, in applying the A–G Guidelines, have established a set of binding "A–G Policies" that are used to routinely deny courses submitted by religious high schools. The official-sounding term "A–G Policies" is a label Plaintiffs created to describe what they believe are secret rules by which Defendants deny Plaintiffs' courses. (Pls.' Opp'n 3.) The extent to which these "A–G Policies" exist is discussed in Part II.A of this Order.

Plaintiffs contend that "[t]hese policies require rejection of courses, regardless of their standard content, that add a single religious viewpoint, any instance of God's

---

dents were ineligible, Plaintiffs should be able to identify a significant number of students excluded from UC because of the course review process. Yet, "Plaintiffs do not show, and there is no evidence, that even one ACSI student has been denied UC eligibility as a result of any actions challenged" in this case. (Defs.' Opp'n 4.)

guidance of history, or any alternative ... to evolution." (Pls.' Reply 1.)

As evidence of these "policies," Plaintiffs submit numerous UC Position Statements regarding the A–G Guidelines. For example, the UC Position Statement concerning history courses notifies Christian schools that they "can develop and submit for UC approval a secular history curriculum with a text and course outline that addresses course content / knowledge generally accepted in the History / Humanities / Social Sciences community." (Pls.' Ex. 242.)

Further, Plaintiffs contend that Defendants use form language when rejecting a course because of religious perspectives. For example, when UC rejects a religious school's biology course, it notifies the school that "[t]he content of the course outlines submitted for approval is not consistent with the viewpoints and knowledge generally accepted in the scientific community." (Pls.' Exs. 1, 246, 305.)

Finally, Plaintiffs rely on the depositions of multiple witnesses who are responsible for reviewing courses or otherwise interpreting the A–G Guidelines. Plaintiffs claim that these depositions reveal that "UC follows a policy rejecting any course in any subject, even if it teaches standard content, if it adds teaching of the school's religious viewpoint." (Pls.' MSJ 6 (citing the depositions of Susan Wilbur, Robert Sharf, James Given, Gary Nash, Mark Petracca, and Francisco Ayala).)

Plaintiffs assert that religious school courses are approved at a lower rate than secular school courses because of these discriminatory policies. For example, for the 2004 school year, 56.3 percent of courses submitted by Christian schools were approved (Pls.' Ex. 287, at 928), while 86.3 percent of courses submitted by secular schools were approved (Pls.' Exs. 286–87). Defendants disagree, providing evidence that religious school courses are denied at about the same rate as other secular private schools. (Wilbur Decl. No. 2 Ex. 1 (graphing course approval rates for various categories of schools, including ACSI schools, "non-Catholic" private schools, and public schools).)

Defendants admit to creating UC Position Statements and form rejection language, but deny Plaintiffs' assertion that UC has a policy of "den[ying] students a-g credit for otherwise acceptable courses that teach standard content and that add religious viewpoints...." (Defs.' Opp'n 1.)

D. *The Parties' Motions for Summary Judgment*

Now, both parties move for summary judgment. Plaintiffs seek summary judgment that the UC course review process is unconstitutional on its face and as applied to Plaintiffs. Defendants seek summary judgment on Plaintiffs' facial claims, reserving for trial their proof that they constitutionally applied their regulations to Plaintiffs' courses.

## II. *DISCUSSION*

Summary judgment is proper only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A "material" fact is one that could affect the outcome of the case, and an issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). When evaluating a motion for summary judgment, the Court "construes the evidence in the light most favorable to the nonmoving party."

*Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir.2005).

Plaintiffs argue that the UC course review process on its face and as applied to Plaintiffs' courses is unconstitutional because the review process:

(1) discriminates against religious viewpoints and regulates speech based on content;

(2) is overbroad;

(3) provides course reviewers with "unbridled discretion";

(4) shows "hostility toward religious schools";

(5) prescribes what shall be orthodox in religion; and

(6) abridges equal protection.

Plaintiffs' six claims require examination of the A–G Guidelines and the purported "A–G Policies" under the Free Speech Clause, the Establishment Clause, the Free Exercise Clause, and the Equal Protection Clause.

### A. The Scope of Plaintiffs' Facial Challenge

The parties disagree as to the scope of Plaintiffs' facial challenge. Defendants argue that a facial challenge is limited to the text of the A–G Guidelines, while Plaintiffs contend that a facial challenge must include analysis of the A–G Policies. Neither party supports its argument with legal authority.

In some circumstances, courts have considered the government's authoritative interpretation of its guidelines and ordinances in a facial challenge. *See, e.g., Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1035 (9th Cir.2006); *see also Forsyth County v. Nationalist Movement*, 505 U.S. 123, 131, 112 S.Ct. 2395, 120 L.Ed.2d 101 (1992) ("In evaluating respondent's facial challenge, we must consider the county's authoritative constructions of the ordinance, including its own implementation and interpreta-

tion of it."). "To affect the constitutional analysis, [an authoritative interpretation] must 'be made explicit by textual incorporation, binding judicial or administrative construction, or **well-established practice.**'" *Food Not Bombs*, 450 F.3d at 1035 (quoting *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 770, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988)).

Through significant documentation and testimony, Plaintiffs have shown that Defendants have a well-established practice of using policies outside of the A–G Guidelines to evaluate courses. Defendants have created UC Position Statements and form language rejection letters by which they consider themselves bound. *See also Ward v. Rock Against Racism*, 491 U.S. 781, 795, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989) ("[T]he city has interpreted the guideline in such a manner as to provide additional guidance to the officials charged with its enforcement."); *cf. Lakewood*, 486 U.S. at 770, 108 S.Ct. 2138 ("This Court will not write nonbinding limits into a silent state statute.").

In addition, Plaintiffs ask the Court to find that Defendants have three specific A–G Policies.

#### 1. The "Single Religious Viewpoint Policy"

First, Plaintiffs contend that Defendants have a policy of rejecting courses that contain standard content, but add a single religious viewpoint. (Pls.' MSJ 6; Pls.' Opp'n 2; Pls.' Reply 1.) Yet, the evidence establishes otherwise.

Defendants have approved many high school courses that include religious material and viewpoints, including courses such as "The Prophetic Voice" (Hargrove Decl. Ex. 3, at 430), "Western Civilization: The Jewish Experience" (Hargrove Decl. Ex. 6, at 574), and "The Bible as Literature" (Hargrove Decl. Ex. 3, at 535). Western Christian Academy submitted its "Lan-

guage Arts 12" course for approval as an English course. (Hargrove Decl. Ex. 3, at 459.) This course relies on a Christian textbook published by Alpha Omega Publications. (Hargrove Decl. Ex. 3, at 461.) The course description includes assignments such as "Write an essay on the Christian view of nature as demonstrated in Jesus' use of elements of nature in His parables" and "Write an essay contrasting the Byronic manner of facing guilt with the way the Bible says Christians should deal with guilt." (Hargrove Decl. Ex. 3, at 462.) Despite its religious content, this course was approved. (Hargrove Decl. ¶ 10.)

Although Defendants disapprove of some Christian "science" textbooks that "prioritize religion over science" when used as the primary or sole text in an A–G Subject course (Hargrove Decl. ¶ 10), they do approve many courses that utilize these texts as secondary texts (Hargrove Decl. ¶ 14; Wilber Decl. No. 2 ¶ 7).[4] Further, Defendants reviewed and approved some Christian textbooks for use as the primary or sole text, including *Chemistry for Christian Schools* and *Physics for Christian Schools*. (Pls.' Ex. 100.) This indicates that Defendants are not withholding approval solely because the course includes a religious viewpoint.

For example, Defendants have approved biology, physics, and chemistry courses using Christian texts, including a chemistry course taught at Calvary that utilized two texts—*Modern Chemistry and Chemistry for Christians* (Hargrove Decl. Ex. 5, at 565) and a biology course taught by Kings Christian High School that utilized three texts—*Biology: God's Living Creation, Biology*, and *Health Biology* (Hargrove Decl. Ex. 3, at 540–44).

Finally, Defendants provide declarations from religious school administrators who have not perceived the discrimination about which Plaintiffs complain. For example, the Assistant Principal for Curriculum at Loyola High School of Los Angeles, a self-described "Jesuit College Preparatory" school, does not believe that "UC discriminates against Catholic high schools by denying [A–G course approval] for courses that otherwise meet UC's academic standards but that add religious content or a religious viewpoint." (Kozakowski Decl. ¶¶ 5–6, 9.) Also, the Director of College Guidance at New Community Jewish High School notes that "[i]n [his] experience, UC has treated New Community and its students fairly and in a non-discriminatory manner." (Lindner Decl. ¶¶ 6–8.) Even administrators at schools that are members of ACSI have admitted that "I can't think of any areas where I felt—I feel like Valley Christian has been treated differently because we're a Christian institution compared to any other school." (Lynch Decl. No. 2 Ex. 115.) Although such anecdotal evidence is of minimal value, it does lend some support to Defendants' assertion that they hold *all* schools—religious or secular—to the same rigorous standards.

The evidence establishes that Defendants do not have a policy of rejecting courses solely because the courses add a religious viewpoint. Plaintiffs provide no evidence of an actual policy. Instead, Plaintiffs rely on the existence of course rejections and abstract hypothetical situations posed to course reviewers and experts, and ask the Court to draw an inference of a "policy" that can be challenged facially.

---

4. However, not all courses restricting use of Christian texts to supplemental status are approved. If the supplemental text "interfere[s] with the students' acquisition of the knowledge, understanding, and skills that UC expects [the student] to have gained," the course may not be approved. (Hargrove Decl. ¶ 10.)

For example, Plaintiffs cite the deposition of Defendants' government expert as evidence that "UC follows the policy of rejecting any course in any subject, even if it teaches standard content, if it adds teaching of the school's religious viewpoint." (Pls.' MSJ 6.) The actual deposition testimony illustrates Plaintiffs' error. Defendants' government expert, Professor Mark Petracca,[5] testified that any government course that presents a "single, unassailable standard for evaluating government, truth, civic and political leaders, culture, and justice" would not be considered "conventional social science" and fails to "prepare students adequately for study at UC." (Petracca Dep. 20–21.) Professor Petracca explains in his expert report that a "single, unassailable standard," regardless of its perspective, contradicts "the pluralistic and inquisitive approach" to the study of government "used by professors and expected of students at UC." (Petracca Decl. Ex. A, at 2.)

Indeed, Petracca elaborates that "I am not saying, either here or elsewhere, that it is inappropriate for the textbook or a course to present a Bible-based or Christian perspective on American government." (Petracca Decl. Ex. A, at 3.) However, it is inappropriate for a college preparatory government course to present a single perspective in a manner that fails to even acknowledge that other analytical frameworks exist. (Petracca Decl. Ex. A, at 3.)

Upon inspection, Plaintiffs' conclusion premised on a few lines of Professor Petracca's deposition does not hold. Petracca's deposition testimony is completely consistent with his expert report.[6] Plaintiffs must show more than the "mere existence of a scintilla of evidence ...; there

must be evidence on which the jury could reasonably find" for Plaintiffs. *See Anderson*, 477 U.S. at 252, 106 S.Ct. 2505; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ("[Plaintiffs] must do more than simply show that there is some metaphysical doubt as to the material facts ....").

Accordingly, there is no genuine issue of material fact as to this issue. Defendants do not have a "well-established practice" of rejecting courses that contain standard content, but add a single religious viewpoint.

### 2. The "History and Social Science Policy"

Second, Plaintiffs contend that Defendants have a policy of rejecting history and social science courses that "add a Christian god" or that are "limited to one denomination or viewpoint." (Pls.' MSJ 9–13.) To the contrary, Defendants provide evidence of approved history courses taught from the perspective of a single religious denomination. (Wilbur Decl. No. 2 ¶¶ 33, 42; Hargrove Decl. ¶ 16, Ex. 6.) In addition to the "Western Civilization: The Jewish Experience" course described above, UC approved courses such as Sierra Christian Academy's "World History" course, which seeks to "understand[ ] and appreciate[ ] the beginnings of Western Civilization from a Judeo–Christian point of view" (Hargrove Decl. Ex. 6, at 592), and Valley Christian High School's "Ancient World History" course, which "cover[ ]s the time frame of *Creation* through the Reformation" (Hargrove Decl. Ex. 6, at 597 (emphasis added)).

---

5. Professor Petracca has served for nine years as the Chair of the Department of Political Science at the University of California, Irvine. (Petracca Decl. Ex. A, at 4.)

6. Similarly, Plaintiffs' "evidence" based on other depositions does not withstand even the slightest scrutiny.

Further, Defendants explain that the mention of God in the explanation of a historical event does not "automatically disqualify a course for approval." (Given Decl. ¶ 5 (noting that supernatural-based explanations of history do not "automatically disqualify a course for approval," but "excessive reliance" on these explanations may prevent approval).) Rather, the focus is on whether the course as a whole meets the UC standards. (Wilbur Decl. No. 2 ¶ 32 ("[T]he mention of God as the explanation of [a] historical event may or may not cause rejection of a course for [history] credit, depending on whether the course, as a whole, meets the UC faculty's expectations for college preparatory history . . . .").)

Again, there is no genuine issue of material fact as to this issue. Defendants do not have a "well-established practice" of rejecting history courses because they "add a Christian god" or "one religious perspective."

### 3. The "Science Policy"

Finally, Plaintiffs contend that Defendants have a policy of rejecting biology courses that, in addition to evolution, contain topics such as theistic evolution, intelligent design, creation, or weaknesses of evolution. (Pls.' MSJ 13–17.) Again, Defendants deny this allegation, explaining that biology courses may include scientific discussion of the weaknesses of evolution, creationism, or intelligent design. (Wilbur Decl. No. 2 ¶ 43 ("A biology course could be approved for [science] credit if it included both an adequate treatment of the theory of evolution and discussion of creationism.").) For example, biology courses that use Christian texts that discuss perceived weaknesses of evolution, creationism, and intelligent design as *supplemental* texts can and have been approved. (Wilbur Decl. No. 2 ¶ 7; Hargrove Decl. Ex. 3, at 540–44 (approving Kings Christian High School's biology course, which used A Beka's *Biology: God's Living Creation* as a supplemental text).)

Once more, there is no genuine issue of material fact as to this issue. Defendants do not have a "well-established practice" of rejecting biology courses that add theistic evolution, intelligent design, creation, or weaknesses of evolution.

In evaluating Plaintiffs' facial challenge, the Court will consider the A–G Guidelines, the UC Position Statements, and form rejection language (collectively referred to as the "A–G Guidelines and Policies").

### B. Plaintiffs' Facial Constitutional Claims

Plaintiffs have brought a variety of constitutional claims against Defendants. They claim that the A–G Guidelines and Policies are unconstitutional on their face because these regulations violate rights guaranteed to religious schools under:

(1) the Free Speech Clause;

(2) the Free Exercise Clause;

(3) the Establishment Clause; and

(4) the Equal Protection Clause.

Each clause is addressed in turn.

#### 1. The Free Speech Clause

Plaintiffs allege that the A–G Guidelines and Policies abridge their freedom of speech because the regulations: (1) discriminate based on viewpoint and content; (2) are overbroad; and (3) grant Defendants unbridled discretion.

##### a. Viewpoint Discrimination and Content Regulation

Plaintiffs vigorously attack the A–G Guidelines and Policies as viewpoint discrimination and content regulation. According to Plaintiffs, "UC policies, confirmed by hundreds of course rejections, discriminate by viewpoint and are content-based in regulation." (Pls.' Reply 3.)

Plaintiffs' briefs rely on *Rosenberger v. Rector & Visitors of University of Virginia*, 515 U.S. 819, 115 S.Ct. 2510, 132 L.Ed.2d 700 (1995), and other public forum cases as the cornerstone of their argument, insisting that " '[v]iewpoint discrimination is . . . an egregious form of content discrimination' " (Pls.' MSJ 4 (quoting *Rosenberger*, 515 U.S. at 829, 115 S.Ct. 2510)) and that " '[d]iscrimination against speech because of its message is presumed to be unconstitutional' " (Pls.' MSJ 21 (quoting *Rosenberger*, 515 U.S. at 828, 115 S.Ct. 2510)).[7]

Yet, not all content-based regulations are subject to strict scrutiny.[8] The Supreme Court has repeatedly rejected a heightened standard where the government is providing a public service that by its nature requires evaluations of, and dis-tinctions based upon, the content of speech. *See, e.g., United States v. Am. Library Ass'n*, 539 U.S. 194, 204–05, 123 S.Ct. 2297, 156 L.Ed.2d 221 (2003); *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998); *cf. Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 672–73, 118 S.Ct. 1633, 140 L.Ed.2d 875 (1998) (generalizing that governmental functions that require content-based judgments, such as selecting programming for a public television station, are not subject to heightened scrutiny).

■ Instead, these regulations are constitutional if they are reasonably related to the government's goal of providing the public service and are not the product of government animus.[9] *See Am. Library*, 539 U.S. at 208, 123 S.Ct. 2297 ("It is

---

**7.** At oral argument, Plaintiffs identified three additional "keystone cases" in support of their argument that were not included in their brief: (1) *Board of Regents of University of Wisconsin System v. Southworth*, 529 U.S. 217, 120 S.Ct. 1346, 146 L.Ed.2d 193 (2000); (2) *Rumsfeld v. Forum for Academic and Institutional Rights, Inc.*, 547 U.S. 47, 126 S.Ct. 1297, 164 L.Ed.2d 156 (2006); and (3) *R.A.V. v. City of St. Paul*, 505 U.S. 377, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992). (Tr. Hr'g 21.) Plaintiffs only discussed one of these cases in depth during its argument *Southworth*, which is easily distinguished from the present case.

In *Southworth*, the University of Wisconsin used student fees "for the sole purpose of facilitating the free and open exchange of ideas by, and among, its students." 529 U.S. at 229, 120 S.Ct. 1346; *see also id.* at 222–23, 120 S.Ct. 1346 ("In the University's view, the activity fees 'stimulat[ed] advocacy and debate on diverse points of view'. . . ."). Accordingly, the Supreme Court found its "public forum cases are instructive by close analogy." *Id.* at 229–30, 120 S.Ct. 1346.

Here, high school courses serve UC by preparing students for academic study, not by "facilitating the free and open exchange of ideas." The close analogy to a public forum in *Southworth* is missing in this case. Similarly, the need for content-based judgments present in this case is missing in *Southworth*.

Perhaps the most relevant portion of the *Southworth* opinion is Justice Kennedy's pronouncement that began his legal analysis: "It is inevitable that government will adopt and pursue programs and policies *within its constitutional powers* but which nevertheless are contrary to the profound beliefs and sincere convictions of some of its citizens." *Id.* at 229, 120 S.Ct. 1346 (emphasis added).

**8.** Plaintiffs spend much of their briefing setting up a "viewpoint discrimination" straw man. But, the analysis in this case is not as simple as Plaintiffs' proffered syllogism: "Viewpoint discrimination is unconstitutional and UC discriminates based on viewpoint, therefore UC's actions are unconstitutional." Accordingly, Plaintiffs' "resounding" success in tearing this straw man down rings hollow. (*See* Pls.' Reply 3 ("UC's silence is resounding on our 22 pages of facts and argument showing that UC policies . . . discriminate by viewpoint and are content-based in regulation.").)

**9.** For reasons explained in Part II.B.I.a.ii., the government may not use otherwise lawful regulations to purposefully suppress a politically disfavored viewpoint. *See Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993).

entirely reasonable for public libraries ... to exclude certain categories of content...."); *Finley,* 524 U.S. at 587, 118 S.Ct. 2168 ("The [government's] mandate is to make aesthetic judgments, and the inherently content-based 'excellence' threshold for [government] support sets it apart from the subsidy at issue in *Rosenberger* ...."); *Forbes,* 523 U.S. at 673–75, 118 S.Ct. 1633 (cautioning against heightened scrutiny when the government necessarily makes content-based determinations).

In *Arkansas Education Television Commission v. Forbes,* the Supreme Court stressed that public television stations generally hold broad editorial discretion to select their content. 523 U.S. at 674, 118 S.Ct. 1633 ("[T]he nature of editorial discretion counsels against subjecting [public] broadcasters to claims of viewpoint discrimination.").[10] Public broadcasters are required to schedule programming that serves the "public interest, convenience, and necessity." *Id.* at 674, 118 S.Ct. 1633 (citing 47 U.S.C. § 309(a)). In fulfilling this duty, a public broadcaster engages in speech activity by "facilitating the expression of some viewpoints instead of others." *Forbes,* 523 U.S. at 674, 118 S.Ct. 1633. The Supreme Court identified additional situations in which a public entity's action necessarily facilitates the expression of some viewpoints to the exclusion of others. For example, "a university selecting a commencement speaker, a public institution selecting speakers for a lecture series,

[and] a public school prescribing its curriculum...." *Id.*

In these situations, heightened scrutiny "would risk implicating the courts in judgments that should be left to the exercise of journalistic discretion." *Id.* Scrutinizing a public station's discretionary decisions would be particularly problematic because "even principled exclusions rooted in sound journalistic judgment can often be characterized as viewpoint-based." *Id.*

■ In *United States v. American Library Ass'n,* the Supreme Court recognized that public libraries "must have broad discretion to decide what material to provide to their patrons." 539 U.S. at 204, 123 S.Ct. 2297 (holding that libraries may reasonably refuse to provide patrons with pornography). In exercising their broad discretion, public libraries necessarily make content-based judgments. *Id.* ("[L]ibraries collect only those materials deemed to have requisite and appropriate quality.").[11] Therefore, public libraries may exclude materials based upon content. *Id.* at 208, 123 S.Ct. 2297 ("The librarian's responsibility ... is to separate out the gold from the garbage, not preserve everything.").

In *National Endowment for the Arts v. Finley,* the Supreme Court held that a government agency could make aesthetic judgments in allocating competitive funding for art projects that demonstrated "excellence." 524 U.S. at 586, 118 S.Ct. 2168. After all, determinations of "excellence" are "inherently content-based." *Id.* Be-

---

10. The ultimate holding in *Forbes*—that a public television station may exclude from a televised debate candidates who lacked adequate public support, but may not exclude candidates with viewpoints disfavored by the station—rested on a narrow exception presented by candidate debates, which are "by design" fora for political speech of exceptional significance. 523 U.S at 675, 118 S.Ct. 1633.

11. Further, the Supreme Court permitted public libraries to regulate Internet content even though it did not review and affirmatively approve or disapprove of each website. *Am. Library,* 539 U.S. at 208, 123 S.Ct. 2297 ("A library's failure to make quality-based judgments about all the material it furnishes from the Web does not somehow taint the judgments it does make.").

cause limited funding was allocated according to a competitive process, the Supreme Court specifically noted that reliance on *Rosenberger* was "misplaced." *Id.*

■ The distribution of grants in *Finley* is the closest parallel to the UC admissions process. In both scenarios, the government is providing a public benefit that is allocated to a limited number of persons through a competitive process.[12] Like the government agency that must judge the excellence of prospective art projects, UC must judge the excellence of prospective students who apply for a guaranteed spot at UC.

It is undisputed that the content of an applicant's high school courses is an important factor in evaluating the merit of that applicant.[13] According to defense expert Dr. Michael Kirst,[14] the content of high school courses is a "crucial variable in predicting whether students will succeed at very selective post-secondary institutions such as the University of California." (Kirst Decl. Ex. A, at 2.) Plaintiffs' experts concur that it is "educationally reasonable" for Defendants to condition admittance on content and skill requirements. For example, Dr. Donald Erickson,[15] one of Plaintiffs' education experts, finds it reasonable for UC to expect admitted students to know, among other things, about "plants," "evolution," "accurate carbon dating," and "the roles of Latinos in United States history." (Lynch Decl. No. 1 Ex. 57.)

Dr. Derek Keenan,[16] another of Plaintiffs' education experts, testified that "critical thinking and analysis skills are legitimate concerns of [UC] in evaluating student preparation." (Lynch Decl. No. 1 Ex. 63.) According to Dr. Keenan, "it's educationally appropriate for [UC] to set standards for the content and skills that need to be mastered for students to attend" (Keenan Dep. 46–47), and "high school course content is an important factor in student preparation for college work" (Keenan Dep. 47).

Still, Plaintiffs argue that *Forbes, American Library,* and *Finley* "do not apply to [UC] admissions decisions and do not apply to [UC's] rejections of private school courses," yet provide no principled reason to depart from the reasoning of these cases.

First, Plaintiffs argue that *Ashcroft v. ACLU,* 542 U.S. 656, 124 S.Ct. 2783, 159 L.Ed.2d 690 (2004), in which a speech regulation was declared unconstitutional, essentially overruled *American Library.* To the contrary, the *Ashcroft* opinion cites *American Library* with approval. *Id.* at 669, 124 S.Ct. 2783. Although both the *Ashcroft* and *American Library* regulations concerned Internet speech, that is the sole similarity. The differences are instructive. The statute in *Ashcroft* criminalized private speech made in a context in which there is no need for content-based judgments. *Id.* at 660, 124 S.Ct. 2783

---

12. Both parties agree that students admitted to UC receive benefits, such as discounted in-state tuition and education from an excellent academic institution. (Pls.' MSJ 3.)

13. The parties' real dispute concerns the academic merit of Plaintiffs' courses.

14. Dr. Kirst is "a longtime professor of education at Stanford University and an authority on college-preparatory curricula and standards." (Defs.' MSJ 10; *see also* Kirst Decl. Ex. A, at 1.)

15. Dr. Erickson retired from teaching after 30 years as a professor, 11 of those years with the University of California, Los Angeles (Erickson Decl. Ex. 1.)

16. Plaintiffs did not provide an expert report or biography from Dr. Keenan, who serves as the Vice President of Academic Affairs for ACSI. *Becoming a Life–Changing Leader,* ACSI.org, https://www.acsi.org/webfiles/webitems/attachments/002914_Bio.doc.

("Content-based prohibitions, enforced by severe criminal penalties, have the constant potential to be a repressive force in the lives and thoughts of a free people."). On the other hand, the regulations in *American Library* did not prohibit or criminally punish speech; they merely limited the speech that a public library made available to the public in a manner consistent with its duty to funnel limited resources toward the most beneficial materials. 539 U.S. at 208, 123 S.Ct. 2297. The A–G Guidelines and· Policies also do not prohibit or criminally punish speech, and the need to evaluate the excellence of each UC applicant requires content-based judgments.

Next, Plaintiffs argue that *Finley* "involved government ... regulation of its own grant standards, not private speech." (Pls.' Opp'n 26 n. 8.) Yet, the regulations that Plaintiffs challenge impact private speech in precisely the same manner as *Finley*. One could just as easily frame the A–G Guidelines and Policies as "government regulation of its own college admissions standards, not private speech." Both here and in *Finley*, the government evaluates, but does not prohibit, private speech in an effort to award benefits based upon a competitive process.

Finally, Plaintiffs futilely attempt to distinguish *Forbes* by incorrectly characterizing the decision as one involving "a public school prescribing its curriculum." (Pls.' Opp'n 26 n. 10.) *Forbes* did not involve a public school; it involved a public television station. 523 U.S. at 674, 118 S.Ct. 1633. In *Forbes*, the Supreme Court analogized a public television station's selection of its programming to a public school's selection of its curriculum, recognizing that both scenarios require the government to make content-based evaluations of private speech. *Id.* The importance of *Forbes* is not its specific factual scenario, but its general principles related to content-based

judgments and the problems inherent in scrutinizing those discretionary judgments.

Accordingly, the A–G Guidelines and Policies must be analyzed under *Finley*, while heeding the Supreme Court's warning in *Forbes* that judicial forays into the exercise of discretion are problematic. Heightened scrutiny is inappropriate here. If the A–G Guidelines and Policies are rationally related to the goal of selecting the most qualified students for admission, they do not violate the First Amendment's guarantee of free speech. *See Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 226 n. 12, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985) ("Discretion to determine, on academic grounds, who may be admitted to study [is] one of 'the four essential freedoms' of a university.") (quoting *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 312, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978)).

i. *The A–G Guidelines and Policies Must Be Rationally Related to UC's Educational Goal of Admitting Qualified Students.*

 It is undisputed that UC can reasonably reject courses that either (1) fail to teach important topics with sufficient accuracy and depth of coverage or (2) fail to teach relevant analytical skills. Now, the Court must consider whether the contested A–G Guidelines and Policies reasonably apply this standard, both substantively and procedurally. Because the test of reasonableness "is not capable of precise definition or mechanical application," its proper application "requires careful attention to the facts and circumstances of each particular case." *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

Still, the rational basis test is extremely deferential to the government and the states. Rational basis review "is not a license for courts to judge the wisdom, fairness, or logic" of government regula-

tion. *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993); *see also City of New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 49 L.Ed.2d 511 (1976) ("[T]he judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations."). Accordingly, government regulation is "accorded a strong presumption of validity." *Heller v. Doe*, 509 U.S. 312, 319, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993). "[T]he burden is on the one attacking the [regulation] to negative every conceivable basis which might support it." *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364, 93 S.Ct. 1001, 35 L.Ed.2d 351 (1973).

### (a) *Are the A–G Guidelines and UC Position Statements Substantively Reasonable?*

Plaintiffs challenge the text of the A–G Guidelines and the following UC Position Statements:

(1) the UC Position Statement on Religion and Ethics Courses;

(2) the UC Position Statement on Science Courses; and

(3) the UC Position Statement on History and Social Science Courses.

### (1) *UC Position Statement on Religion and Ethics Courses*

UC advises schools that, in order to receive A–G Subject credit, courses in religion or ethics should "treat the study of religion or ethics from the standpoint of scholarly inquiry rather than in a manner limited to one denomination or viewpoint" and "should not include among its primary goals the personal religious growth of the student." (Pls.' Ex. 243.)

Defendants have offered expert testimony from Professor Sharf[17] defending this policy. Professor Sharf explains that the UC policy reflects the scholarly approach taken in the discipline of religious studies. "One of the methodological foundations of the [discipline] is the ability to step back and gain intellectual and emotional distance from the subject matter. (Sharf Decl. Ex. A, at 3.) By focusing on their own personal religious growth, students lack the "basic critical skill" required for academic study of religion—the ability to take a more observer-independent view. (Sharf Decl. Ex. A, at 13.) Professor Sharf finds the Position Statement on Religion and Ethics Courses to be reasonable because "scholarly detachment is requisite for the unbiased analysis into the nature of religious phenomena." (Sharf Decl. Ex. A, at 4.)

Plaintiffs provide no evidence that the Position Statement on Religion and Ethic Courses is facially unreasonable, submitting only deposition testimony from Professor Daniel Guevara.[18] While Professor Guevara opines that several rejected religion courses are "excellent" or "amazing" (Guevara Dep. 88, 93), he never challenges Professor Sharf's support for the Position Statement. Instead, Professor Guevara only claims "I don't see that [a goal of religious growth] would spoil" a course for UC approval. (Guevara Dep. 124.) This conclusion with no factual basis does not meet Plaintiffs' burden to show a genuine issue as to whether they can negate "every conceivable basis which might support" the Position Statement. *See Lehnhausen*, 410 U.S. at 364, 93 S.Ct. 1001. Other evidence submitted by Plaintiffs recognizes that "it

---

**17.** Professor Sharf is the Director of Religious Studies at the University of California, Berkeley. (Sharf Decl. Ex. A, at 3–4.)

**18.** Plaintiffs did not provide an expert report or biography from Professor Guevara, who

teaches philosophy at the University of California, Santa Cruz. *See UCSC Philosophy Department People*, UC Santa Cruz, http://philosophy.ucsc.edu/people.html.

is crucial that the distinction between religious studies and theology—between teaching and preaching—be maintained in higher and secondary education." (Pls.' Ex. 414, at 141.) "It is important to draw a sharp distinction ... between studying a religion as an academic enterprise and thinking about the divine on behalf of one's religious community." (Pls.' Ex. 414, at 141.)

Accordingly, there is no genuine issue of material fact as to this issue. The UC Position Statement on Religion and Ethics Courses is reasonable.

### (2) UC Position Statements on Science and History Courses

Plaintiffs base their claims against the UC Position Statements on Science and History Courses on the false assertion that these Position Statements require a secular curriculum without religious viewpoints. (Pls.' MSJ 11 ("In other words, there *must* be a 'secular history curriculum' without religious viewpoints."), 16 ("The [Science] Position Statement also means that *only* a 'secular science curriculum' (no religious viewpoint added) is approved.").) Yet, the Position Statements do not use the word "must"; rather, they use the word "can" (Pls.' Exs. 241–42), indicating that a "secular" curriculum is not mandatory for approval. Indeed, as discussed in Part II.A, Defendants have approved numerous science and history courses that incorporate religious viewpoints.

The rest of the Position Statements reinforce the purpose of the A–G Guidelines: Admitted students must attain "essential critical thinking and study skills," "the necessary preparation for courses, majors, and programs offered at [UC]," and "a body of knowledge that will provide breadth and perspective to new, more advanced studies." (Pls.' Exs. 241–42.)

There is no genuine issue of material fact as to this issue. The UC Position Statements on Science and History Courses are reasonable.

### (b) Are the Reviewers Qualified?

Plaintiffs insinuate that the UC employees charged with reviewing high school courses are not sufficiently qualified to implement the A–G Guidelines and Policies. According to Plaintiffs, "[course] review is by staff reviewers in the Office of the President, who with one exception have only college degrees and not more than a single college course in each subject.[19] UC's review is not by faculty members except in rare cases when they are sent a questioned course." (Pls.' MSJ 2.)

Defendants counter that each reviewer is provided with guidance for course review decisions, such as "subject matter descriptions, interpretive notes elaborating on these descriptions, [examples] of approved courses, competency standards and more." (Defs.' Opp'n 25 (citing Lynch Decl. No. 1 Ex. 2).) Further, UC reviewers can and do obtain additional guidance by consulting with other UC employees with specialized subject-area knowledge, including faculty. (Hargrove Decl. ¶¶ 3, 6 ("UC faculty members with PhDs review courses and textbooks about which staff reviewers have questions."); Lynch Decl. No. 2 Ex. 92.) In addition, Defendants contest Plaintiffs' allegation that course reviewers have limited educations, noting that "[s]ome of the UC staff reviewers also have post-bachelor's degrees, and most of the staff reviewers have had more than

---

**19.** As support for this allegation, Plaintiffs cite only the deposition transcripts of two reviewers, Nina Costales and Jeanne Hargrove. Yet, Costales testified that she received about one year of graduate studies in education, and more than one class in English. (Costales Dep. 26–29.) Hargrove also testified that she took more than one class in history, English, and possibly government. (Hargrove Dep. 14–17).

one college course in the subjects reviewed." (Hargrove Decl. ¶ 6.)

There is no genuine issue of material fact here. The course reviewers are reasonably guided and qualified to make course approval determinations.

### (c) *Is the UC Course Review Process Unreasonably "Probabilistic"?*

Plaintiffs complain that the UC course review process is "only 'probabilistic,' approving some poor courses where students do not learn and rejecting some good courses where students do learn." (Pls.' MSJ 2.) "Because UC reviews only course descriptions, it cannot know how a teacher will teach a course; a bad outline could be taught well, or a good outline could be taught poorly." (Pls.' MSJ 2.)

UC admits the probabilistic nature of its course review process. (Defs.' Opp'n 6 ("Given the impracticability of observing all classes, the course review process is necessarily 'probabilistic' . . . ."); Tr. Hr'g 62 ("There's no certainty to [the course review process], . . . but all of the experts agree that it's a reasonable way to do it.").)

■ Under the deferential rational basis standard "courts are compelled . . . to accept [the government's] generalizations even when there is an imperfect fit between means and ends." *Heller*, 509 U.S. at 321, 113 S.Ct. 2637. The government may act if there is "a rational basis for doing so . . ., even if it 'is probably not true' that those reasons are valid in the majority of cases." *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 86, 120 S.Ct. 631, 145 L.Ed.2d 522 (2000). A regulation does not fail rational-basis review because it " 'is not made with mathematical nicety or because in practice it results in some inequality.' " *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970) (quoting *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 78, 31 S.Ct. 337, 55 L.Ed. 369 (1911)). "The problems of government are practical ones and may

justify, if they do not require, rough accommodations—illogical, it may be, and unscientific." *Metropolis Theatre Co. v. Chicago*, 228 U.S. 61, 69–70, 33 S.Ct. 441, 57 L.Ed. 730 (1913).

Here, there is no dispute that it is reasonable for UC to ensure that its admitted students took courses likely to have prepared them adequately for academic study. (Kirst Decl. Ex. A, at 1 ("Studies have found that the most important college preparation is the acquisition of sufficient content and critical thinking skills in high school courses."); Erickson Dep. 51–52 ("[UC has the right to determine] what content students should know before they come to UC."); Keenan Dep. 47 ("[C]ritical thinking and analysis skills are legitimate concerns of [UC] in evaluating student preparation.").) In addition, both parties agree it is better for UC to have more information about applicants than less, and that course descriptions give UC more information about course content than titles alone.

UC "relies upon an adequate syllabus (prepared by the teacher) as an indicator that the course will adequately prepare students, and a poor syllabus (again, prepared by the teacher) as an indicator to the contrary." (Defs.' Opp'n 6 (citing Lynch Decl. No. 2 Ex. 93).) Although this process is not certain, it is reasonable. (*See* Kirst Decl. Ex. A, at 10 (concluding that the UC course review process "is a reasonable and effective way to bridge the gap between high school and college").)

There is no genuine issue of material fact here. The UC course review process is not unreasonably probabilistic.

### (d) *Is Reviewing Only California High School Courses Reasonable?*

Plaintiffs claim that the unreasonableness of the A–G Guidelines and Policies are evident in Defendants' failure to require out-of-state applicants to take UC-

approved courses. (Pls.' MSJ 3.) To the contrary, it is reasonable for UC to limit its course review on California schools. Graduates of California high schools make up more than ninety percent of UC applicants. (Wilbur Decl. No. 1 ¶ 4.) "It would be unreasonably burdensome to expect UC to review courses from all schools in the United States." (Defs.' Opp'n 6.) Just because UC does not make individualized determinations where it would not be feasible to do so, does not discredit the determinations UC does make. *See Am. Library*, 539 U.S. at 208, 123 S.Ct. 2297 (noting that a public library's inability to evaluate all Internet content does not diminish its discretion to evaluate other materials).

There is no genuine issue of material fact here. It is reasonable for UC to require approval for California high school courses, but not for out-of-state high schools.

Accordingly, the A–G Guidelines and Policies survive rational basis review.[20]

ii. *Defendants Cannot Implement Regulations Because of Animus Toward Religion. Even If Those Regulations Are Rationally Related to UC's Educational Purpose.*

Even if the A–G Guidelines and Policies are rationally related to UC's educational purpose, Plaintiffs can still prevail if they demonstrate that the regulations are the result of government animus towards religious viewpoints.[21] In *Finley*, the Supreme Court repeatedly emphasized that the government may not punish disfavored viewpoints under the guise of legitimate regulations. 524 U.S. at 587, 118 S.Ct. 2168 ("[T]he Government may not 'aim at the suppression of dangerous ideas' . . . .") (quoting *Regan v. Taxation with Representation of Wash.*, 461 U.S. 540, 550, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983)); *id.* ("[A] more pressing constitutional question would arise if government [regulation was] calculated to drive 'certain ideas or viewpoints from the marketplace.'") (quoting *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991)); *id.* ("If the [government] were to leverage its power to [regulate speech] into a penalty on disfavored viewpoints, then we would confront a different case.").

Although there is no guidance from the Ninth Circuit or the Supreme Court regarding government animus in the specific arena of free speech, two Supreme Court decisions have addressed the issue in the context of the Free Exercise Clause: *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993), and *Locke v.*

---

20. Plaintiffs also argue that the course review process is unreasonable because UC "has no data showing [that added religious content] interfere[s]" with teaching required content. (Pls.' Reply 7.) Government action "may be based on rational speculation unsupported by evidence or empirical data." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993). As discussed in Part II.B.1.a.i.(a), the theoretical support for the UC course review process demonstrates its rationality. (*See also* Defs.' Opp'n 14 n. 20 ("It is reasonable for UC to set its admissions standards based on the considered judgment of its own faculty, even without quantitative evidence, and Plaintiffs cite no

authority to the contrary.").) In addition, UC notes that empirical data "would not be feasible . . ." (Defs.' Opp'n 13–14 n. 20.)

21. This discriminatory intent analysis is not universally accepted, *Lukumi*, 508 U.S. 520, 558, 113 S.Ct. 2217 (1993) (Scalia, J., concurring) ("[The First Amendment] does not put us in the business of invalidating laws by reason of the evil motives of their authors."), but has garnered favor with a majority of the Supreme Court., *id.* at 547, 113 S.Ct. 2217 (Kennedy, J.) ("Legislators may not devise mechanisms, overt or disguised, designed to persecute or oppress a religion or its practices.").

*Davey,* 540 U.S. 712, 124 S.Ct. 1307, 158 L.Ed.2d 1 (2004).

In *Lukumi,* the plaintiffs challenged a city ordinance that targeted the Santeria religion under the guise of a legitimate regulation on animal slaughter. 508 U.S. 520, 113 S.Ct. 2217. Leaning on "the principle that the First Amendment forbids an official purpose to disapprove of a particular religion or of religion in general," the Supreme Court invalidated the ordinance because it was not neutral and it was not a law of general applicability. *Id.* at 532, 113 S.Ct. 2217.

In *Locke,* the plaintiff challenged a state scholarship program that was available to all qualifying college students except for those "pursuing a degree in theology." 540 U.S. at 716, 124 S.Ct. 1307. Over Justice Scalia's vigorous dissent, the Supreme Court extended the *Lukumi* test to require an element of animus, even if the government regulation was not neutral. *Id.* at 724, 124 S.Ct. 1307 ("Far from evincing the hostility toward religion which was manifest in *Lukumi,* [the scholarship program] goes a long way toward including religion in its benefits."); *see also id.* at 731, 124 S.Ct. 1307 (Scalia, J., dissenting) ("The Court makes no serious attempt to defend the program's neutrality...."). Requiring strict scrutiny solely because a government regulation was not neutral "would extend the *Lukumi* line of cases well beyond not only their facts but their reasoning." *Id.* at 720, 124 S.Ct. 1307.

Although decided under the Free Exercise Clause, *Lukumi* and *Locke* guide this Court's analysis of Plaintiffs' claim under the Free Speech Clause.[22] The animus requirement is equally applicable whether the government is punishing disfavored viewpoints or disfavored religious practices. In this case, importing the test used in free exercise cases is particularly appropriate because Plaintiffs complain of discrimination against religious speech.[23] *Cf. Capitol Square Review & Advisory Bd. v. Pinette,* 515 U.S. 753, 767, 115 S.Ct. 2440, 132 L.Ed.2d 650 (1995) (observing that "private religious expression receives preferential treatment under the Free Exercise Clause"); *Widmar v. Vincent,* 454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981) (invalidating restrictions on religious speech under both the Free Speech and Free Exercise Clauses).

Here, the A–G Guidelines and Policies are more like the scholarship program in *Locke* than the criminal prohibition in *Lukumi.* In *Locke,* the Supreme Court noted that the challenged scholarship program was distinguishable from the invalidated criminal statute in *Lukumi* in three fundamental ways. First, the scholarship program imposed a "far milder" burden on religion. 540 U.S. at 720, 124 S.Ct. 1307. Second, the scholarship program went "a long way" to include religion. *Id.* at 724, 124 S.Ct. 1307. Finally, the history of the ordinance did not reveal animus toward religion. *Id.* at 725, 124 S.Ct. 1307. The Supreme Court upheld the scholarship program even though it expressly discriminated against theology majors.

The A–G Guidelines and Policies share the same critical distinctions found in *Locke.* First, any burden on religious schools or their students is mild, particularly when compared to the heavy criminal

---

**22.** Plaintiffs themselves contend that *Lukumi* is the proper framework for determining whether the purpose of a law is to restrict practices because of their religious motivation. (Pls.' Opp'n 17 (comparing UC to the city council in *Lukumi* ).)

**23.** Indeed, government regulation of religious speech has been challenged under the Free Exercise Clause. *See, e.g., Am. Family Ass'n v. City & County of San Francisco,* 277 F.3d 1114 (9th Cir.2002).

penalties at stake in *Lukumi.* UC does not penalize students for taking non-approved courses or attending schools that teach non-approved courses. Should a student attend a religious school that does not offer approved courses in the A–G Subjects, that student may demonstrate proficiency in a number of alternative ways.

Second, UC "goes a long way" to accommodate religious school students. Defendants offer students alternative ways of demonstrating proficiency in the A–G Subjects (*see* Part I.A) and offer religious schools personalized assistance in creating curriculums that would earn approval. (Pls.' Ex. 240 (UC Position Statement) ("[UC] is happy to provide additional assistance to high schools, including Christian schools, through a collaborative consultation process, in order to help the schools create course outlines that meet the faculty's 'a-g' course requirements.").)

Finally, there is little in the history of the A–G Guidelines and Policies to demonstrate that Defendants were motivated by an improper purpose. Plaintiffs' best evidence of animus is their characterization of the deposition testimony from the former chair of the UC board responsible for the A–G Guidelines and Policies, Michael Brown, that the "subtext" of Defendants' discussion in adopting the UC Position Statement on science was "antagonism toward the Christian schools," and that religious schools' "right wing perspectives were highly objectionable."[24]

Brown's actual deposition testimony was as follows:

Q: Did the emotional tenor of any others on the BOARS committee in your view reflect antagonism toward the Christian schools or what they taught?

A: It was my assessment that that was the subtext. It wasn't that anybody ever said they're Christian schools, we ain't approving them, but I had the sense that their feelings about radical or fundamentalist ... right wing perspectives were highly objectionable.

(Brown Dep. 143–44.)

Even construing this evidence in the light most favorable to Plaintiffs, Brown's testimony is insufficient to create a genuine issue of material fact. Brown's "assessment" and "sense" that the committee was antagonistic is of little value without concrete factual support. In addition, the power of Plaintiffs' quotation is tempered by their omission of the words "radical" and "fundamentalist." These adjectives suggest the Board's "feelings" concerned extreme views inconsistent with knowledge generally accepted in the relevant academic community rather than antagonism toward religion. Further, Brown admitted in his deposition that his "assessment" did not apply to the entire board. (Brown Dep. 144 ("Most [board members] were quiet.... Trying to, in my view, reason it out.... I was actually honored by that. I really appreciated being in that context to see [board members] trying to grapple with it.").) An email Brown sent to the board after the allegedly antagonistic discussion confirms his appreciation: "I remain deeply appreciative of the tenor of [the] discussion ... regarding the issue of approving science courses ... submitted from 'Christian' schools.... I thought the [board members] participated in a frank, thoughtful, and sensitive manner." (Pls.' Ex. 157.)

---

24. At oral argument, Plaintiffs conceded that "[w]e do not intend to argue the case based on proving animus." (Tr. Hr'g 39; *see also* Tr. Hr'g 40 ("[W]e have cited in our brief the primary evidence that would support a finding of animus. We are not doing so to argue animus.").)

These facts stand in stark contrast to those in *Lukumi,* where the animus was "manifest." *See Locke,* 540 U.S. at 724, 124 S.Ct. 1307. There, "the record ... compel[ed] the conclusion that suppression of the central element of the Santeria worship service was the object of the [city] ordinance." 508 U.S. at 534, 113 S.Ct. 2217. First, the penalties were stiff. Violators of the ordinance could be imprisoned for up to sixty days and fined up to $500. *Id.* at 528, 113 S.Ct. 2217. Second, the ordinances were aimed at "one of the principal forms of devotion" in the Santeria worship, animal sacrifice. *Id.* at 524, 113 S.Ct. 2217. Finally, "[t]he burden of the ordinance, in practical terms, [fell] on Santeria adherents but almost no others." *Lukumi,* 508 U.S. at 536, 113 S.Ct. 2217. The city had made no attempt to address the issue of animal killing until after a Santeria church announced its plans to open within the city. *Id.* at 541, 113 S.Ct. 2217. Taped excerpts of a city meeting at which the issue was addressed "evidence[d] significant hostility [from] residents, members of the city council, and other city officials toward the Santeria religion." *Id.*

A few examples of the comments in *Lukumi* provide a sharp distinction from Brown's "sense" of antagonism: Crowd members cheered statements made by council members that were critical of Santeria and taunted members of the Santeria church. *Id.* One councilman said that Santeria devotees "are in violation of everything this country stands for" and another asked "[w]hat can we do to prevent the Church from opening?" *Id.* A city official told the city council that Santeria was a sin, "foolishness," "an abomination to the Lord," and the worship of "de-

mons" and urged the city council "not to permit this Church to exist." *Id.* at 541–42, 113 S.Ct. 2217. Also, the city attorney commented that the ordinance indicated that "[t]his community will not tolerate religious practices which are abhorrent to its citizens." *Id.* at 542, 113 S.Ct. 2217.

Given the Supreme Court's caution against extending *Lukumi* too far beyond its facts, *Locke,* 540 U.S. at 720, 124 S.Ct. 1307, there is no genuine issue of material fact as to this issue. Defendants were not motivated by animus in setting the A–G Guidelines and Policies.

### b. *Overbreadth*

■ Plaintiffs argue that the UC course review process is facially overbroad under the Free Speech Clause. The overbreadth doctrine is an "exception from general standing rules" that allows a plaintiff to seek facial invalidation of a law that "sweeps too broadly, penalizing a substantial amount of speech that is constitutionally protected," even if that law is constitutional as applied to the plaintiff. *Forsyth County,* 505 U.S. at 129–30, 112 S.Ct. 2395. This doctrine recognizes that "the very existence of some broadly written laws has the potential to chill the expressive activity of others not before the court." *Id.* at 129, 112 S.Ct. 2395.

To succeed on their overbreadth claim,[25] Plaintiffs must show that the A–G Guidelines and Policies "punish a 'substantial' amount of protected free speech, 'judged in relation to the statute's plainly legitimate sweep.'" *Virginia v. Hicks,* 539 U.S. 113, 118–19, 123 S.Ct. 2191, 156 L.Ed.2d 148 (2003) (quoting *Broadrick v. Oklahoma,* 413 U.S. 601, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973)).

■ For support, Plaintiffs rely heavily on the erroneous assumption that Defen-

---

**25.** Plaintiffs ignore their overbreadth claim in their Motion, but address it in response to Defendants' Motion.

dants have a policy of rejecting all courses that add a religious viewpoint. Indeed, that policy (if it existed) would likely cause Defendants to incorrectly reject a large number of courses that meet UC's academic standards.[26] However, the face of the A–G Guidelines and Policies consistently stress that courses must prepare students for college, a legitimate goal of the state. Plaintiffs have provided little evidence that any course (let alone a substantial number) technically falls under the text of the A–G Guidelines and Policies, but nevertheless prepares students for college. Rather, Plaintiffs' evidence, at best, alleges that Defendants incorrectly apply the A–G Guidelines and Policies to Plaintiffs' courses because those courses do teach students the knowledge and skills necessary for college.[27]

There is no genuine issue of material fact as to this issue. The A–G Guidelines and Policies are not overbroad.

### c. *Unbridled Discretion*

Plaintiffs argue that the UC course review process is facially unconstitutional under the Free Speech Clause because the course reviewers exercise "unbridled discretion" to grant or deny course approval. (Pls.' MSJ 26 ("The long-settled rule is that 'unbridled discretion in the hands of a government official or agency constitutes a prior restraint' on freedom of expression.") (quoting *Lakewood*, 486 U.S. at 757, 108 S.Ct. 2138).) Defendants argue that an "unbridled discretion" challenge is only available in the context of a licensing statute or other prior restraint and therefore

does not apply to the A–G Guidelines and Policies. (Defs.' Opp'n 24–25.)

### i. *Plaintiffs Cannot Challenge the A–G Guidelines and Policies Under the "Unbridled Discretion" Doctrine.*

■ The Supreme Court has expressly noted that whether regulations other than licensing schemes are subject to the "unbridled discretion" analysis is an open question. *Ward,* 491 U.S. at 794, 109 S.Ct. 2746 ("Since [the plaintiff] does not claim that city officials enjoy unguided discretion to deny the right to speak altogether, it is open to question whether [the plaintiff's] claim falls within the narrow class of permissible facial challenges to allegedly unconstrained grants of regulatory authority."). In *Ward,* the Supreme Court sidestepped this threshold question, finding that even if the plaintiff could bring an unbridled discretion challenge, it would fail. *Id.*

Still, the majority in *Ward* strongly suggested that regulations other than prior restraints should not be subject to the "extraordinary doctrine" that permits facial challenges on the grounds of overly broad discretion. *Id.* at 793–94, 109 S.Ct. 2746. "[T]he regulations we have found invalid as prior restraints have 'had this in common: they gave public officials the power to deny use of a forum in advance of actual expression.'" *Id.* at 795 n. 5, 109 S.Ct. 2746 (quoting *Se. Promotions, Ltd. v. Conrad,* 420 U.S. 546, 553, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975)).

Noting that the city regulation at issue "is of an entirely different, and less, order of magnitude" than regulations that could

---

**26.** Because this policy does not exist (*see* Part II.A), the Court will not determine whether the amount of speech that would have been rejected under Plaintiffs' hypothetical policy is "substantial" enough to warrant facial invalidation.

**27.** Also persuasive is that high schools are not additionally punished for submitting a reject-

ed course. Unlike speakers who may not be willing to test the constitutionality of a law that could put them in jail—one of the reasons the overbreadth doctrine exists—high schools are in the same position after a course is rejected as before. All that is lost is the time the school employees spent putting together the course description.

deny a speaker the ability to speak, the Supreme Court observed that its prior cases permitting an unbridled discretion challenge "have generally involved licensing schemes that Ves[t] unbridled discretion in a government official over whether to permit or deny expressive activity.'" *Id.* at 793–94, 109 S.Ct. 2746 (quoting *Lakewood,* 486 U.S. at 755, 108 S.Ct. 2138). "The relevant question is whether the challenged regulation authorizes suppression of speech in advance of its expression, and the [challenged regulation] does not." *Id.* at 795 n. 5, 109 S.Ct. 2746.

Likewise, the A–G Guidelines and Policies do not forbid expressive activity. Religious schools may teach any course and their students may take any course without penalty.

Plaintiffs cite *Broadrick v. Oklahoma,* 413 U.S. 601, 613, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973), for the proposition that "unbridled discretion" may invalidate regulations other than licensing. Plaintiffs assert that the "Supreme Court says the unchecked discretion over speech *is* the prior restraint. . . ." (Pls.' Reply 10.) For support, Plaintiffs rely on dicta[28] from *Broadrick* that unbridled discretion challenges are permitted where "[expressive or communicative] conduct has required official approval under laws that delegated standardless discretionary power to local functionaries, resulting in virtually unreviewable prior restraints on First Amendment rights." 413 U.S. at 613, 93 S.Ct. 2908.

Plaintiffs' argument is misplaced. *Broadrick* singles out expressive activity that "required official approval." *Id.* It

follows, then, that *Broadrick* contemplates situations in which the government holds the power to prevent the speech before it even begins. Such a restriction meets the very definition of a prior restraint. This conclusion is supported by the *Broadrick* passage from which Plaintiffs selectively quote; it discusses prior restraints. The statute at issue in *Broadrick* was a prior restraint that prohibited state employees from engaging in certain political speech. *Id.* at 602, 93 S.Ct. 2908. Moreover, the four cases the Supreme Court cites in support of Plaintiffs' selective quotation from the *Broadrick* opinion all involved licensing statutes. *Id.* at 613, 93 S.Ct. 2908 (citing *Shuttlesworth v. Birmingham,* 394 U.S. 147, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969) (invalidating a statute that criminalized publicly demonstrating without a permit), *Cox v. Louisiana,* 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965) (reversing a criminal conviction for obstructing traffic when publicly demonstrating without prior approval from city officials), *Kunz v. New York,* 340 U.S. 290, 71 S.Ct. 312, 95 L.Ed. 280 (1951) (invalidating a statute that criminalized holding a religious meeting without a permit), and *Lovell v. City of Griffin,* 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949 (1938) (invalidating a statute that criminalized distributing pamphlets without a permit)).

The correct interpretation of Plaintiffs' *Broadrick* quote is not that standardless discretionary power creates a prior restraint, but that standardless discretionary power makes existing prior restraints "virtually unreviewable."

Accordingly, Plaintiffs cannot challenge the A–G Guidelines and Policies under the

---

**28.** The Court emphasizes that Plaintiffs' quote is irrelevant to the Supreme Court's decision in *Broadrick.* The *Broadrick* plaintiffs did not challenge the statute under the unbridled discretion doctrine. Nor did the Supreme Court perform an unbridled discretion analysis. Rather, the Supreme Court identified the un-

bridled discretion doctrine as one of the "limited exceptions" to the general standing requirement, which usually allows plaintiffs to challenge only regulations that are unconstitutional as applied to them. *Broadrick,* 413 U.S. at 610, 93 S.Ct. 2908.

"extraordinary doctrine" that prohibits unbridled discretion.

### ii. *Even If Permitted, Plaintiffs' "Unbridled Discretion" Challenge Would Fail.*

Laws invalidated under the "unbridled discretion" doctrine gave city officials "unbounded discretion to grant or deny a permit application and to place unlimited additional terms and conditions on any permit that was issue[d]." *Lakewood*, 486 U.S. at 755, 770, 108 S.Ct. 2138 ("It is apparent that the face of the ordinance itself contains no explicit limits on the mayor's discretion."). Likewise, in *Saia v. New York*, there were "no standards" to guide the police chiefs discretion. 334 U.S. 558, 560, 68 S.Ct. 1148, 92 L.Ed. 1574 (1948).

In contrast, UC course reviewers are given "subject matter descriptions, interpretive notes elaborating on these descriptions, [examples] of approved courses, competency standards and more." (Defs.' Opp'n 25 (citing Lynch Decl. No. 1 Ex. 2).) Further, UC reviewers can obtain additional guidance by consulting with other UC employees with specialized subject-area knowledge, including faculty. (Rashid Decl. No. 1 ¶ 6; Hargrove Decl. ¶ 3; Lynch Decl. No. 2 Ex. 92.)

There is no genuine issue of material fact as to this issue. Defendants have sufficient guidance to defeat a challenge of unbridled discretion.

Defendants are entitled to summary judgment on Plaintiffs' unbridled discretion claim.

### 2. *Free Exercise and Establishment Clauses*

Plaintiffs allege that the A–G Guidelines and Policies: (1) exhibit hostility toward religious schools, in violation of the Free Exercise Clause and Establishment Clause; and (2) prescribe what shall be orthodox in religion, in violation of the Free Exercise Clause.

#### a. *Hostility Toward Religious Schools*

Plaintiffs allege that the A–G Guidelines and Policies are "hostile" towards religious schools on their face.[29] Again, the parties disagree on which test governs Defendants' alleged conduct. Plaintiffs provide no test at all in their opening brief, stating only that "hostility towards religion" is forbidden. (Pls.' MSJ 24 (citing *Lynch v. Donnelly*, 465 U.S. 668, 673, 104 S.Ct. 1355, 79 L.Ed.2d 604 (1984)).) Plaintiffs' Complaint contends that "hostility to religion" violates the Establishment Clause. Defendants argue in their Opposition that "claims of hostility should be evaluated under the Free Exercise Clause, not the Establishment Clause." (Defs.' Opp'n 28 (citing *Lukumi*, 508 U.S. at 532, 113 S.Ct. 2217).)

In the Ninth Circuit, both the Establishment Clause and Free Exercise Clause govern claims of hostility to religion, depending on the nature of the hostility. Claims of hostility in the form of symbolic disapproval of religion are evaluated under the Establishment Clause. *See Am. Family Ass'n v. City & County of San Francisco*, 277 F.3d 1114, 1120–21 (9th Cir.2002).[30] Claims of hostility in the

---

29. Plaintiffs also include a laundry list of allegedly hostile actions that are not covered by their facial claims. These allegations are addressed in Part II.C.2.

30. In *American Family*, the Ninth Circuit determined that a hostility claim under the Free Exercise Clause could only survive if the

plaintiff alleged "specific religious conduct that was affected by the [government's] actions." 277 F.3d at 1124. Because symbolic disapproval does not, by definition, burden religious conduct, any Free Exercise Claim based on symbolic disapproval fails. *Id.* ("[A]lleging a subjective chilling effect on free exer-

form of laws that burden a plaintiff's ability to practice his religion are evaluated under the Free Exercise Clause. *Lukumi,* 508 U.S. at 532, 113 S.Ct. 2217; *see also Locke,* 540 U.S. 712, 124 S.Ct. 1307.

Here, the A–G Guidelines and Policies could fall under either clause, depending on how the evidence is viewed. In the light most favorable to Defendants, the course-review process at worst symbolically disapproves of the academic value of Plaintiffs' beliefs. In the light most favorable to Plaintiffs, the course-review process burdens students who must take additional tests to demonstrate proficiency in the A–G Subjects.

i. *Symbolic Hostility Under the Establishment Clause*

■ Although Establishment Clause claims typically challenge government action that allegedly benefits religion, the clause also governs "a claim brought under a hostility to religion theory." *Am. Family,* 277 F.3d at 1121; *see also Vernon v. City of Los Angeles,* 27 F.3d 1385, 1396 (9th Cir.1994) ("The government neutrality required under the Establishment Clause is ... violated as much by government disapproval of religion as it is by government approval of religion.").

■ "Notwithstanding its 'checkered career,' *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), continues to set forth the applicable constitutional standard for assessing governmental actions challenged under the Establishment Clause." *Vasquez v. Los Angeles County,* 487 F.3d 1246, 1254 (9th Cir.2007) (quoting *Santa Fe Indep. Sch. Dist. v. Doe,* 530 U.S. 290, 319, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000) (Rehnquist, C.J., dissenting)). Under *Lemon,* government action does not violate the Establishment Clause if it: (1) has a secular purpose, (2) has a primarily secular effect; and (3) does

cise rights is not sufficient to constitute a

not excessively entangle the government with religion. 403 U.S. at 612–13, 91 S.Ct. 2105.

(a) *Secular Purpose*

■ Government action "will stumble on the purpose prong 'only if it is motivated wholly by [the] impermissible purpose'" of endorsing or disapproving religion. *Kreisner v. City of San Diego,* 1 F.3d 775, 782 (1993) (quoting *Bowen v. Kendrick,* 487 U.S. 589, 602, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988)). The Court must focus "solely on purpose" and cannot "question the propriety of the means to achieve that purpose or whether the defendants were correct or even reasonable in the assumptions underlying their actions...." *Am. Family,* 277 F.3d at 1121. In addition, the court "must be 'reluctant to attribute unconstitutional motives' to government actors in the face of a plausible secular purpose." *Kreisner,* 1 F.3d at 782 (quoting *Mueller v. Allen,* 463 U.S. 388, 394–95, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983)).

Here, a secular purpose is plainly evident. UC aims to admit the most qualified students and ensure that those students have the knowledge and skills necessary to succeed at UC.

(b) *Secular Effect*

■ Under the effect prong of the *Lemon* test, the Court must determine whether, from the perspective of an informed and reasonable observer, the government's action has "the principal or primary effect of advancing or inhibiting religion." *Am. Family,* 277 F.3d at 1122.

Here, a reasonable person would not find the primary effect of the UC course review process to be inhibition of religion. UC approves many courses that include religious perspectives or are submitted by

substantial burden.").

religious schools. Additionally, an informed observer would be aware of the controversial nature of intelligent design and creation as scientific beliefs. *See Kitzmiller v. Dover Area School District,* 400 F.Supp.2d 707, 764 (E.D.Pa.2005); *McLean v. Ark. Bd. of Educ.,* 529 F.Supp. 1255, 1259 (E.D.Ark.1982) (dismissing "creation science" as "simply not a science"). No reasonable and informed observer could conclude that refusing to recognize intelligent design as science or other religious beliefs as academics has the primary effect of inhibiting religion.

Therefore, Defendants meet the secular effect prong of the *Lemon* test.

### (c) *Excessive Entanglement*

Plaintiffs contend that government evaluations of religious content excessively entangle the government with religion. (Pls.' MSJ 26.) This argument is undermined by two Supreme Court cases in which public schools argued that they must exclude religious speech because allowing the speech would result in excessive entanglement. *See Bd. of Educ. v. Mergens,* 496 U.S. 226, 253, 110 S.Ct. 2356, 110 L.Ed.2d 191 (1990) (invalidating a public high school policy excluding religious after school clubs); *Widmar,* 454 U.S. 263, 102 S.Ct. 269 (invalidating a state university policy prohibiting the use of buildings or grounds for religious worship). In both cases, the Supreme Court recognized that excluding religious speech posed a *greater* risk of "entanglement" because the public schools would have to determine what words and activities fell within the prohibited categories of religious worship and religious teaching. *Widmar,* 454 U.S. at 272 n. 11, 102 S.Ct. 269; *see also Mergens,* 496 U.S. at 253, 110 S.Ct. 2356 ("[D]enial of equal access to religious speech might well create greater entanglement problems in the form of invasive monitoring to prevent religious speech . . . .").

While "invasive monitoring" designed to root out religious speech may constitute impermissible entanglement, application of the A–G Guidelines and Policies to private schools does not implicate this potentially unconstitutional consequence. First, these regulations do not require Defendants to identify religious speech. Rather, Defendants are charged with determining what content and skills are necessary for college preparation, and whether high school courses adequately teach the necessary content and skills.

Second, there is no invasive monitoring. *See Widmar,* 454 U.S. at 272 n. 11, 102 S.Ct. 269 ("There would also be a continuing need to monitor group meetings to ensure compliance with the rule."). Religious schools seeking course approval need only submit a course description to UC. Defendants do not monitor classroom instruction to ensure that students are taught the approved content. The A–G Guidelines and Policies do not excessively entangle the government with religion.

There is no genuine issue of material fact here. Defendants are entitled to judgment as a matter of law on Plaintiffs' facial Establishment Clause claim.

### ii. *Burdensome Hostility Under the Free Exercise Clause*

 Plaintiffs also argue that the UC course review process violates the Free Exercise Clause because UC imposes a substantial burden on religious school students' right to practice their religion. The analysis under the Free Exercise Clause has changed drastically over the past twenty years. Formerly, *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963), governed Free Exercise claims. Under *Sherbert,* any government conduct or regulation that substantially burdened a religious practice was unconstitutional unless it was narrowly tailored to achieve a compelling state interest. 374 U.S. at 402–03, 83 S.Ct. 1790. The

government's burden was high. *Id.* at 407, 83 S.Ct. 1790. ("[I]n this highly sensitive constitutional area, 'only the gravest abuses, endangering paramount interests, give occasion for permissible limitation.'") (quoting *Thomas v. Collins*, 323 U.S. 516, 530, 65 S.Ct. 315, 89 L.Ed. 430 (1945)).

In 1990, the Supreme Court radically changed course, effectively overruling *Sherbert* in *Department of Human Resources of Oregon v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). Under *Smith*, if prohibiting the exercise of religion is not the object of the law, but merely the incidental effect of a generally applicable law, then there is no Free Exercise violation.[31] *Id.* at 884, 110 S.Ct. 1595 ("To make an individual's obligation to obey [otherwise valid laws of general application] contingent upon the law's coincidence with his religious beliefs, except where the State's interest is 'compelling' ... contradicts both constitutional tradition and common sense."). The *Smith* Court held that the Free Exercise Clause does not require a case-by-case assessment of the religious burdens imposed by facially constitutional laws. *Id.* at 883–90, 110 S.Ct. 1595.

In *Lukumi*, the Supreme Court clarified its holding in *Smith*, observing that a free exercise violation would exist if the plaintiff showed that the challenged law is either not neutral or not generally applicable. 508 U.S. at 531–34, 113 S.Ct. 2217. Finally, in *Locke*, the Supreme Court went a step further. Under *Locke*, the law must be the product of animosity toward religion. 540 U.S. at 724, 124 S.Ct. 1307.

Because Plaintiffs' free exercise claim is subject to the same test as their free speech claim—the regulations must be rationally related to a legitimate state interest and not motivated by animus—the results are identical as well. As discussed in Part II.B.1.a.ii, the A–G Guidelines and Policies are closer to the civil regulation in *Locke* than the criminal prohibition in *Lukumi* because of the relatively mild burden placed on religious schools and their students, Defendants' attempts to accommodate religion, and the lack of evidence concerning animus.

Accordingly, there is no genuine issue of material fact as to animus or the reasonableness of the A–G Guidelines and Policies under the Free Exercise Clause.

### b. *Prescription of Orthodoxy*

Plaintiffs selectively quote Supreme Court precedent as the basis for a cause of action in bringing their claim that the A–G Guidelines and Policies "prescribe what shall be orthodox in ... religion." (Pls.' MSJ 23 (quoting *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943)).) In *American Family*, the plaintiff brought a claim against the government for "prescrib[ing] an orthodoxy of belief on the subject of homosexuality." 277 F.3d at 1124. The Ninth Circuit noted that the "dozens of cases" supporting the "principle that the government cannot prescribe matters of opinion or belief" involved compelled speech. *Id.* As discussed above, the A–G Guidelines and Policies do not compel or prohibit speech. Religious schools are free to teach any belief system they choose.

There is no genuine issue of material fact here. Defendants are entitled to sum-

---

**31.** In response to *Smith*, Congress enacted the Religious Freedom Restoration Act ("RFRA"), which required strict scrutiny for laws that "substantially burdened" a person's ability to practice their religious beliefs. *See* 42 U.S.C. § 2000bb–1. Finding that Congress had exceeded its power, the Supreme Court declared RFRA to be unconstitutional when applied to state and local regulations. *See City of Boerne v. Flores*, 521 U.S. 507, 516, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997).

mary judgment on Plaintiffs' "prescription" claim.

### 3. *Equal Protection Clause*

As an alternative basis for relief, Plaintiffs argue that the A–G Guidelines and Policies violate the Equal Protection Clause by discriminating against religious schools.[32] (Pls.' Reply 10.) As to claims of religious discrimination, if the defendant's actions do not violate the Free Exercise Clause, then courts will apply only rational basis scrutiny to equal protection claims based on religion. *Locke,* 540 U.S. at 720 n. 3, 124 S.Ct. 1307 ("Because we hold that the program is not a violation of the Free Exercise Clause, . . . we apply rational basis scrutiny to [the plaintiffs] equal protection claims."); *see also Johnson v. Robison,* 415 U.S. 361, 375 n. 14, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974) (applying "the traditional rational-basis test" to an equal protection claim premised on religious discrimination that did not violate the Free Exercise Clause).

As discussed in Part II.B.1.a.i, there is no genuine issue of material fact as to whether the UC course review process satisfies rational basis scrutiny.[33]

### C. *Plaintiffs' "As Applied" Constitutional Claims*

Plaintiffs also challenge Defendants' application of the A–G Guidelines and Policies to specific courses for which Plaintiffs sought approval and were rejected under the Free Speech, Free Exercise, Establishment, and Equal Protection Clauses.

### 1. *Free Speech Clause*

Plaintiffs challenge Defendants' application of the A–G Guidelines under the Free Speech Clause, arguing that Defendants' rejections of Plaintiffs' courses were unconstitutional viewpoint discrimination and content regulation.[34]

As discussed in Part II.B.1, Defendants necessarily facilitate some viewpoints over others in judging the excellence of those students applying to UC. Therefore, unless a decision to deny course approval was unreasonable in light of UC's goal to admit the most qualified students or was the product of animus, that decision is constitutional.

Plaintiffs' "as applied" claims concern rejected courses that fall into four subjects: (1) biology; (2) history and government; (3) English; and (4) religion. (*See* Watters Decl. Apps. A–C.) Plaintiffs do not provide an analysis as to why any of the more than 150 courses rejected by UC should have been approved. Rather, Plaintiffs only claim that the courses were unconstitutionally rejected pursuant to UC's unconstitutional policies, such as the "Single Religious Viewpoint Policy."

However, the Court earlier found that these policies did not exist. Therefore, Plaintiffs have not supplied any basis for their summary judgment request on the

---

**32.** Plaintiffs analogize their claims to those in *Regents v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978), where "it violated equal protection to render Caucasian males ineligible for 16 of 100 seats in the entering class." (Pls.' MSJ 29.) As discussed in footnote three, Plaintiffs' assertion that the A–G Guidelines and Policies "render Christian school students ineligible for ninety-eight percent of the seats in the [UC] entering class" is mistaken. (Pls.' MSJ 29.)

**33.** Plaintiffs also claim that Defendants violate the Equal Protection Clause by requiring course approval for graduates of California high schools, but not for graduates of out-of-state high schools. (Pls.' Reply 10.) Because California high school students are not a suspect class, this practice is subject to rational review. As discussed in Part II.B.1.a.i.(f), Defendants' decision not to evaluate out-of-state high school courses is reasonable.

**34.** The overbreadth and unbridled discretion doctrines only apply to facial challenges.

as-applied challenges to the rejection of specific courses. The Court is not obligated to consider matters not specifically brought to its attention. *See Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir.2001) ("A district court is 'not required to comb the record [when ruling on] a motion for summary judgment.'"). Still, the Court will determine whether Defendants supply a rational basis for their rejection of Plaintiffs' courses.

Because only Plaintiffs seek summary judgment on their "as applied" claims, the Court reviews the evidence in the light most favorable to Defendants to determine if a genuine issue of material fact exists.

### a. *Plaintiffs' Rejected Biology Courses*

▆▆▆ Plaintiffs challenge Defendants' decision to reject biology courses that used *Biology: God's Living Creation* (published by A Beka) or *Biology for Christian Schools* (published by Bob Jones University ("BJU")) as the primary text. (Defs.' Opp'n 8.) Around early 2003, UC Professor Barbara Sawrey reviewed these two Christian biology textbooks [35]

and concluded that they were inappropriate for use as primary texts in college-preparatory science classes. (Sawrey Decl. ¶ 3.) Professor Sawrey found these texts problematic because they characterized religious doctrine as scientific evidence, included scientific inaccuracies, failed to encourage critical thinking, and took an "overall un-scientific approach to the subject matter." (Defs.' Opp'n 9; Sawrey Decl. ¶ 3.) [36]

Sawrey's "judgment was based not on the fact that the textbooks contained religious references and viewpoints, but on [her] conclusion that [the texts] would not adequately teach students the scientific principles, methods, and knowledge necessary for them to successfully study those subjects at UC." (Sawrey Decl. ¶.) [37] After forming her conclusions, Professor Sawrey shared her findings with other members of the course review committee, who supported her conclusions. (Sawrey Decl. ¶ 4.)

Defendants' biology experts, Professors Donald Kennedy [38] and Francisco Ayala, [39]

35. Professor Sawrey also reviewed a Christian chemistry textbook published by BJU. (Sawrey Decl. ¶ 3.) She concluded this chemistry text could adequately serve as the primary text for UC-approved courses. (Sawrey Decl. ¶ 3.)

36. The UC Position Statement on Science Courses reflects these concerns: The texts in question are primarily religious texts; science is secondary.... Courses that utilize these texts teach students that their conclusions must conform to the Bible, and that scientific material and methods are secondary. Students who [are] taught to discount the scientific process and the scientific conclusions validated by a wealth of scientific research are not being provided with an understanding of scientific principles expected by the UC faculty.
(Wilbur Decl. No. 2 Ex. 2.)

37. Similarly, some Christian schools have declined to use BJU and A Beka textbooks because of concerns about the texts' academic

merit. (Lynch Decl. No. 1 Exs. 47B ("[Valley Christian School] felt that the A Beka books ... did not represent the same level of academic rigor as we could find in some other texts."), 47C ("[Patten Academy declined to use A Beka and BJU textbooks] because they didn't provide the content that the principal and faculty believed would prepare the youngsters to meet their post-high school goals."); *cf.* Lynch Decl. No. 1 Ex. 47A ("[Oaks Christian School] acknowledge[s] that there was a much fuller treatment of evolution in the secular book that [it] used [than the BJU biology textbook, which it did not use].").)

38. Professor Kennedy, the editor-in-chief of *Science* magazine, teaches biology at Stanford University, where he once served as President of the University. (Kennedy Decl. Ex. A, at 4–5.)

39. Professor Ayala teaches biological sciences at University of California, Irvine. (Ayala Decl. Ex. A, at 4.)

concur in her judgment. Professor Kennedy determined that "[b]y teaching students to reject scientific evidence and methodology whenever they might be inconsistent with the Bible ... both texts fail to encourage critical thinking and the skills required for careful scientific analysis." (Kennedy Decl. Ex. A, at 8.) Professor Ayala found that the texts "reject the methodology generally accepted in science, which relies on observation and experimentation and on the formulation of laws and theories that need to be tested rather than accepted on the basis of the Bible or any other authority." (Ayala Decl. Ex. A, at 4.)

Both professors concluded that neither of the two Christian textbooks are appropriate for use as the principal text in a college preparatory biology course. (Ayala Decl. Ex. A, at 28; Kennedy Decl. Ex. A, at 20.) In making this finding, Professor Kennedy reiterated Professor Sawrey's initial conclusion that "the problem is not ... that the creationist view is taught as an alternative to scientific explanations, but that the nature of science, the theory of evolution, and critical thinking are not taught adequately." (Kennedy Decl. Ex. A, at 7.)

Plaintiffs' evidence also supports Defendants' conclusion that these biology texts are inappropriate for use as the primary or sole text. Plaintiffs' own biology expert, Professor Michael Behe,[40] testified that "it is personally abusive and pedagogically damaging to de facto require students to subscribe to an idea.... Requiring a student to, effectively, consent to an idea violates [her] personal integrity. Such a wrenching violation [may cause] a terrible educational outcome." (Behe Decl. ¶ 59.)

Yet, the two Christian biology texts at issue commit this "wrenching violation." For example, Biology for Christian Schools declares on the very first page that:

(1) " 'Whatever the Bible says is so; whatever man says may or may not be so,' is the only [position] a Christian can take...."

(2) "If [scientific] conclusions contradict the Word of God, the conclusions are wrong, no matter how many scientific facts may appear to back them."

(3) "Christians must disregard [scientific hypotheses or theories] that contradict the Bible."

(Phillips Decl. Ex. B, at xi.)

Defendants have raised a genuine issue of material fact as to whether their rejection of Plaintiffs' biology courses was reasonable.

### b. *Plaintiffs' Rejected History and Government Courses*

Plaintiffs challenge Defendants' decision to deny history and government courses that used primary texts published by BJU or A Beka. Professor James Given, while on the UC course review committee, reviewed the United States history textbook published by BJU and concluded that the text failed to adequately teach critical thinking and modern historical analytic methods. Professor Given reached this conclusion because the text:

> instructs that the Bible is the unerring source for analysis of historical events, attributes historical events to divine providence rather than analyzing human action, evaluates historical figures and their contributions based on their religious motivations or lack thereof and contains inadequate treatment of several major ethnic groups, women, and non-Christian religious groups.

(Given Decl. ¶ 8.)

Defendants' history expert, Professor Gary Nash,[41] concurred with Professor

---

**40.** Professor Behe teaches biological sciences at Lehigh University. (Behe Decl. 47.)

**41.** Professor Nash has taught history at the University of California, Los Angeles for "nearly forty years." (Nash Decl. Ex. A, at 3.)

Givens' evaluation, finding that the text should not be used as the primary text for a college-preparatory history course. (Nash Decl. Ex. A, at 6.) Specifically, Nash found that the text failed to encourage "historical thinking skills and analytical thinking" and failed to cover "major topics, themes, and components of United States history." (Nash Decl. Ex. A, at 6.) "From reading the [reviewed text], students will have little opportunity to exercise independent judgment, to sharpen their critical thinking skills, or to consider multiple perspectives of those who made our history." (Nash Decl. Ex. A, at 9.) These students "will have difficulty understanding history as a discipline as it has been practiced since Herodotus and Thucydides—a never-ending quest to reconstruct the past based on new evidence and informed by new questions posed about the functioning of past societies." (Nash Decl. Ex. A, at 9.)

Defendants' government expert, Professor Mark Petracca, evaluated a government text published by BJU that each of the rejected government courses relied on as the primary or sole text, finding that "[u]se of this [text] as the principal text in a United States government course will not provide adequate preparation for study at UC." (Petracca Decl. Ex. A, at 2.) Professor Petracca found that the BJU government text does not acknowledge the commonly-accepted framework for scholarly analysis and provides little opportunity for critical thinking. (Petracca Decl. Ex. A, at 2.) In addition, the text contains "many factual and empirical assertions that are not generally accepted among political scientists [or] historians and that are nevertheless not substantiated within the text by evidence." (Petracca Decl. Ex. A, at 3.)

Defendants have raised a genuine issue of material fact as to whether their rejection of Plaintiffs' history and government courses was reasonable.

c. *Plaintiffs' Rejected English Course*

Plaintiffs challenge Defendants' decision to deny one English course that used a primary text published by A Beka. First, the A Beka text (*Classics for Christians*) is an "anthology of excerpts," which UC will not approve, no matter the content of the excerpts. "College-preparatory courses are expected to require students to read full-length works." (Defs.' Opp'n 12; Lynch Decl. No. 1 Ex. 2, at 5.) Plaintiffs' English expert, Dr. Sandra Stotsky,[42] agreed that a general rule against anthologies of excerpts is reasonable. (Lynch Decl. No. 2 Ex. 104.) Second, Jeanne Hargrove, a UC course reviewer, found the A Beka text inappropriate as a primary text in English because its "selection of works and pedagogical apparatus were inconsistent with ... expectations regarding critical thinking and broad exposure to writers' key works." (Hargrove Decl. ¶ 5.)

Defendants' English expert, Professor Samuel Otter,[43] concurs, finding that the A Beka text is inadequate for a college-preparatory English class because it "fails to provide substantial readings and because it insists on specific interpretations [of those readings]." (Otter Decl. Ex. A, at 4.) These deficiencies rendered the text inadequate to provide "analytical and critical skills." (Otter Decl. Ex. A, at 4.) Further, Otter explains that the text fails to meet

---

**42.** Dr. Stotsky is an independent researcher and consultant in education. She received her doctorate in reading research and reading education from the Harvard Graduate School of Education and serves on the National Mathematics Advisory Panel. (Stotsky Decl. Ex. 1.)

**43.** Professor Otter has taught American literature for sixteen years at the University of California, Berkeley. (Otter Decl. Ex. A, at 3.)

UC standards "not because it offers a 'Christian and civic' perspective on its materials but because it fails to provide substantial readings and because it insists on specific interpretations." (Otter Decl. Ex. A, at 4.) "Such a combination contradicts the emphasis on analytical and critical thinking required [by the A–G Guidelines]." (Otter Decl. Ex. A, at 7.)

Defendants have raised a genuine issue of material fact as to whether their rejection of Plaintiffs' English course was reasonable.

d. *Plaintiffs' Rejected Religion Courses*

The majority of courses that Plaintiffs claim were unconstitutionally rejected were rejected under the UC Policy on Religion and Ethics Courses. (Defs.' Opp'n 12.) This policy requires that approval will be given to religion courses if they "treat the study of religion or ethics from the standpoint of scholarly inquiry rather than in a manner limited to one denomination or viewpoint" and should not have as a primary goal promoting the "personal religious growth" of students. (Lynch Decl. No. 1 Ex. 3.) As discussed in Part II.B.1.a.i.(a).(1), Defendants have offered expert testimony from Professor Sharf, which led this Court to determine that the policy was reasonable. Because Plaintiffs only argue that their courses were unreasonably rejected because the UC Policy on Religion and Ethics courses is unconstitutional, the reasonableness of the Defendants' rejections dovetails with the reasonableness of the UC Policy on Religion and Ethics Courses.

Accordingly, there is a genuine issue of material fact as to whether Defendants' rejection of Plaintiffs' religion courses was reasonable.

2. *Free Exercise and Establishment Clauses*

Plaintiffs contend that Defendants exhibit unconstitutional "hostility" toward religion. Plaintiffs' allegations of hostility cover a broad range of hostile acts. (*See, e.g.*, Pls.' MSJ 24 ("UC's policies ... single out (and thus discriminate against) religious schools that add religious viewpoints...."), 25 ("[A UC reviewer] laughed at a creationist statement.").) Defendants' allegedly hostile acts can be divided into two general categories: (1) UC employees made statements, held beliefs, or took actions that are symbolically hostile to religion or religious schools; and (2) UC employees—in implementing the A–G Guidelines and Policies—took hostile actions that burdened Plaintiffs' religious practice. These categories are analyzed under the Establishment Clause and Free Exercise Clause, respectively.

a. *Symbolic Hostility Under the Establishment Clause*

■ The *Lemon* test governs "a claim brought under a hostility to religion theory." *Am. Family*, 277 F.3d at 1121; *see also Vernon*, 27 F.3d at 1396 (9th Cir.1994) ("The government neutrality required under the Establishment Clause is ... violated as much by government disapproval of religion as it is by government approval of religion."). Under *Lemon*, government action does not violate the Establishment Clause if it: (1) has a secular purpose, (2) has a primarily secular effect, and (3) does not excessively entangle the government with religion. 403 U.S. at 612–13, 91 S.Ct. 2105.

Plaintiffs allege the following actions and beliefs symbolically disapprove of their religion:

(1) "[UC] reviewers spoke sarcastically of 'our favorite, Bob Jones University Press,' and of 'our favorite books,' and laughed at a creationist statement."

(2) "[UC reviewers] circulated an article about how 'the Red States, on the other hand, now have to cope with ... 100% of all Televangelists, ...

Bob Jones University, ... and [things generally viewed as disfavorable, such as mosquitoes]. A small price to pay for controlling the presidency."

(3) "[AUC] reviewer told the review coordinator that a 'Christian Lifestyles' course was 'weird stuff.'"

(4) "The faculty reviewer of the Christian school science texts believes that theistic evolution is illogical, the later faculty reviewer has 'antipathy' toward creation...."

(5) "The senior reviewer is Buddhist, and the reviewer who handled religious school science courses and drafted most policies is Jewish...."

(6) "The new chair of [the UC review board] testified the 'subtext' of BOARS discussion in adopting the science Position Statement was 'antagonism toward the Christian schools,' and their 'right wing perspectives were highly objectionable.'"

(7) "[UC] reviewers segregated the Christian school courses into a separate list."

(8) "UC ordered copies of a number of BJU Press texts, and created a 'Bibliography of Christian Books Reviewed,' even though UC does not normally review textbooks (just course outlines), to reject them."

(9) "[UC] created form 'letters that [UC] sent to Christian schools when [UC] denied some of their courses.'"

(Pls.' MSJ 25–26.)

As a threshold matter, some of Plaintiffs' allegations can be discarded immediately as unworthy of summary judgment. First, allegations (1) and (2) are not "government conduct." There is no indication that it is the official position of UC to laugh at creationist statements or poke fun at "the Red States." These "hostile actions" contrast greatly with those in *American Family*, where the government formally adopted resolutions that criticized religious speech. 277 F.3d at 1119. At best, Plaintiffs have discovered inappropriate and hostile remarks made by UC employees at the expense of religion. However distasteful those statements may have been, they are not fairly characterized as government action even if told in the work environment.[44] *See Single Moms, Inc. v. Mont. Power Co.*, 331 F.3d 743, 747 (9th Cir.2003) ("[I]ndividual action may be treated as the government's action if ... that seemingly private behavior may be fairly treated as that of the State itself."); *see also Am. Family*, 277 F.3d at 1125 ("[P]ublic officials may criticize practices that they would have no constitutional ability to regulate, so long as there is no actual or threatened imposition of government power or sanction.").

Also, allegations (3) and (4) cannot support a claim of hostility. Even if these allegations were true, UC employees may believe whatever they choose to believe. Plaintiffs have not demonstrated that these beliefs affect the way that Defendants review courses, an issue that would require evaluation under the Free Exercise Clause. (*See, e.g.*, Pls.' MSJ 25 ("[T]he coordinator of reviewers believes any course with one religious viewpoint added must be rejected.").)

Additionally, allegation (5) cannot support a hostility claim. UC is under no duty to employ only those individuals whose religious beliefs coincide with Plaintiffs.

---

44. Even if the comments made by UC reviewers were unconstitutional hostility towards religion, the judicial remedy would not be to invalidate the A–G Guidelines and Policies as Plaintiffs request.

Finally, this Court has previously found that allegation (9) added little to an analysis of motive. (*See* Part II.B.1.a.ii.)

Remaining are allegations (7), (8), and (9), which all relate to Defendants' implementation of the A–G Guidelines and Policies that Plaintiffs claim could be seen as disapproving of religion.[45] Plaintiffs contend that by keeping a separate list of Christian courses, taking the "unusual" step of reviewing Christian textbooks, and creating form language to reject Christian courses, Defendants could be seen as requiring religious courses to pass greater scrutiny than secular courses.[46]

### i. Secular Purpose

Defendants provide a simple secular reason for the challenged actions: they were "respon[ding] to certain Christian school representatives' challenges to UC decisions (including threats of and the actual filing of this lawsuit)...." (Hargrove Decl. ¶ 26.) Under the threat of litigation and the subsequent exacting scrutiny that comes with litigation, Defendants took greater care to document their decisions. "Because some Christian schools had complained about rejections of certain of their courses, [UC] decided that questionable courses from those schools would be reviewed by the committee and then in many cases by faculty before they were either approved or disapproved." (Hargrove Decl. ¶ 21.)

### ii. Secular Effect

Here, an informed and reasonable observer would not find Defendants' action to have "the principal or primary effect of ... inhibiting religion." *See Am. Family*, 277 F.3d at 1122. Paying more attention to Christian school courses because the Christian schools are vocal about rejections and threatening legal action appears perfectly reasonable.

### iii. Excessive Entanglement

As discussed in Part II.B.2.a.i.(c), Defendants' actions pose no danger of invasive monitoring. Rather, these actions only serve to help Defendants make a more informed and considered judgment as to whether Plaintiffs' courses meet UC's academic standards.

### b. Burdensome Hostility Under the Free Exercise Clause

Plaintiffs allege that several of Defendants' actions and beliefs inhibit Plaintiffs' ability to practice their religion:

(1) "UC's policies ... single out ... religious schools that add their religious viewpoint."

(2) "[UC reviewers], in rejecting Christian school science texts and courses, did not question that the courses cover the required science, but objected to the added religious viewpoint."

(3) "[T]he coordinator of reviewers believes any course with one religious viewpoint added must be rejected."

(4) "[T]he faculty reviewer of the history texts believes that courses may

---

**45.** Allegation (8), as phrased by Plaintiffs, is not supported by any evidence. Although UC ordered Christian textbooks to review, there is no evidence that UC ordered Christian textbooks "to reject them." (Pls.' MSJ 25.) In fact, some Christian textbooks were approved for use as a primary text. (Sawrey Decl. ¶ 3.) In evaluating allegations (7), (8), and (9) under the Establishment Clause, the Court will only consider that UC ordered Christian textbooks for review.

**46.** Plaintiffs make no attempt to analyze these allegedly hostile actions under *Lemon*, arguing only that the actions are hostile and that hostility is forbidden. (Pls.' MSJ 24–25 ("The Supreme Court has frequently stated that 'hostility toward religion' is forbidden.... [These actions are] unconstitutional hostility toward religion, as a matter of law.").)

not attribute any event in history to 'a Christian god.' "

(5) "[UC] reviewers all wrote that religion courses taught by Cantwell / Sacred Heart of Mary should be rejected because they taught a single perspective."

(Pls.' MSJ 24–26.)

Again, some of Plaintiffs' allegations can be discarded immediately as unworthy of summary judgment. As described in Part II.A, allegations (1) and (2) are simply incorrect.

Allegations (3) and (4) also present a problem. These allegations are each phrased as a "belief" of a single reviewer.[47] Plaintiffs provide no evidence that these beliefs resulted in the rejection of any courses "with one religious viewpoint" or any history courses that "attribute [even a single] event in history to 'a Christian god.' " Further, the evidence presents an issue of material fact as to whether allegations (3) and (4) are true. Plaintiffs' evidence is less than compelling,[48] and UC provides declarations from the reviewers refuting Plaintiffs' allegations. (*See* Hargrove Decl. ¶ 11 ("I do not hold any such belief."); Given Decl. ¶ 5 ("I have not recommended against approval of courses merely because they … present religious … explanations of history. Nor does any reference to providential explanations of history automatically disqualify a course for approval in my view.").)

Finally, there is a genuine issue of material fact as to the truth of allegation (2), that "[UC] reviewers all wrote that reli-

gion courses taught by Cantwell / Sacred Heart of Mary should be rejected because they taught a single perspective." Plaintiffs cite to documents showing various notes regarding concern about the Cantwell courses, but ignore that these notes express numerous additional concerns. (Pls.' Ex. 282.) These concerns included a lack of prerequisites, a lack of details in key assignments, a need for "broader study of sociological topics," a focus on "religious training," a lack of depth, the use of a questionable text, and "not academically rigorous." (Pls.' Ex. 282.)

Because there is a material issue of genuine fact regarding the existence of Plaintiffs' allegations of hostility, summary judgment is inappropriate on this issue.

### 3. *Equal Protection Clause*

Plaintiffs also challenge Defendants' application of the A–G Guidelines under the Equal Protection Clause. Again, Plaintiffs argue that Defendants' actions treat religious schools and their students differently. As before, if these actions are not unconstitutional under the Free Exercise Clause, Defendants need only supply a rational basis for the actions. As discussed in Part II.C.2, Defendants have raised a genuine issue of material fact as to the rational basis for their actions.

### III. *RULING*

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment is DENIED and Defendants' Motion for Partial

---

**47.** As discussed in Part II.A, these alleged "beliefs" are not UC policy.

**48.** First, Plaintiffs claim that reviewer Jeanne Hargrove believes courses "with one religious viewpoint" should be rejected based solely on two pages of handwritten notes regarding a rejected course. (Pls.' Ex. 302.) Plaintiffs ignore that these notes indicate numerous other problems with the courses.

Second, Plaintiffs claim that Professor James Given believes history courses should be rejected if they "attribute [even a single] event in history to 'a Christian god' " based solely his comment that "[h]istory is not made by supernatural agents" when rejecting a history course from The Kings Academy. (*See* Pls.' Ex. 130.)

Summary Judgment is GRANTED as to Plaintiffs' facial claims.

Remaining as issues for trial are the reasonableness of Defendants' challenged decisions to deny approval for specific religious school courses under the A–G Guidelines and Policies and Plaintiffs' other "as applied" challenges.

IT IS SO ORDERED.